David Wayne CASEY, Jr., Appellant

v.

The STATE of Texas, Appellee.

No. PD–0548–05.

Court of Criminal Appeals of Texas.

Feb. 28, 2007.

Cynthia Barbare and Robert N. Udashen, Dallas, for Appellant.

Patricia Poppoff Noble, Asst. District Atty., Dallas, Matthew Paul, State's Atty., Austin, for State.

## OPINION

HOLCOMB, J., delivered the opinion of the Court, in which, KELLER, P.J., MEYERS, WOMACK, JOHNSON, KEASLER, HERVEY, and COCHRAN, JJ., joined.

Appellant David Wayne Casey was charged with aggravated sexual assault

under Texas Penal Code § 22.021(a)(1)(A)(i), (2)(A)(vi) (Vernon Supp.2006). He was tried before a jury and convicted of the lesser offense of sexual assault. The Third Court of Appeals reversed appellant's conviction, holding that twenty-four photographs admitted over objection were offered merely to show appellant's propensity to commit crimes and were unfairly prejudicial. *Casey v. State*, 160 S.W.3d 218, 226–28 (Tex. App.-Austin 2005) (citing TEX.R. EVID. 401, 404 & 403). In a second issue, the court of appeals concluded that the use of the word "victim" in the jury charge was "clearly calculated to injure appellant's rights and was therefore harmful." *Id.* at 230 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (op. on reh'g)). We reverse the judgment of the court of appeals.

## I.

*Relevant Facts*

Appellant and one of his friends, Scott Cannon, were tried jointly for drugging and sexually assaulting K.T., the complainant. Cannon was acquitted, appellant was convicted, and the jury sentenced him to a twenty-year prison term.

K.T. met appellant at a party a couple of months prior to the offense. Chris Nunn, K.T.'s then-boyfriend and appellant's friend, introduced K.T. to appellant at the party. By the time of the offense, K.T. was no longer dating Nunn.

On the night of the offense, K.T. was working as a waitress at topless bar.[1] She called appellant on her cell phone to see what he was doing. K.T. got another call and told appellant that she would call him back, but appellant and Cannon arrived at the bar a short time later to see K.T. K.T. then conversed with appellant and Cannon and had at least one drink with them.[2] Appellant and Cannon invited K.T. to appellant's house "to hang out," and she accepted.

K.T. followed Cannon and appellant to his house in her own car. After arriving at appellant's house, the three were joined by appellant's roommate, Jessie Diaz, and his female companion, Brandy. Appellant, Diaz, and Cannon went into the kitchen and prepared some vodka "shots" for everyone. When the men returned to the living room, the shots were passed around to everyone; Diaz handed K.T. a shot. K.T. testified that she drank only part of the shot because she did not like the taste and she generally did not drink much. However, K.T. was encouraged[3] to drink the rest of it, and she did.

K.T. testified that she felt extremely intoxicated about one minute after drinking the vodka shot and lost consciousness, although she had brief intervals of partial lucidity throughout the rest of the evening. K.T. described these intervals as follows: "[I felt] weak and nauseous mostly, most of all nauseous. And I mean I could see, but it was just like I would see double. Like I would see for a second then I would see it double, and then I would throw up and then I would pass back out." K.T. further testified that these moments of partial coherence lasted approximately a minute or less.

K.T. remembered first being dragged from the living room and into a hallway.

---

1. By the time of trial, K.T. had become a stripper at the topless bar.

2. K.T. testified that she had one-and-a-half alcoholic beverages at the club before leaving for appellant's house.

3. K.T. testified that appellant, Cannon, and/or Diaz pressured her to drink the shot by saying, "Don't be a pussy like your boyfriend, Chris [Nunn]."

At this point, she realized her shirt had been removed and she was vomiting and defecating. She saw appellant and Cannon standing over her discussing what to do with her. While in the hallway, she perceived several camera flashes, which caused her to squint her eyes. The next recollection she had, she was naked and appellant "was between her legs," penetrating her with his penis. Cannon was standing behind appellant, and K.T. believed that Cannon was using a camcorder, because she could "see the light flashing." K.T. next recalled Cannon penetrating her while appellant watched, although Cannon was "having problems" because she was "trying to close [her] legs."

K.T. testified that she felt "helpless" and explained that she tried to tell them to stop, "but I really couldn't move my mouth or my arms or anything. I was trying to but I was very weak. The first time I tried to say something I was kind of crying . . . I was just saying, 'No.' But it wasn't very loud. I noticed I was really weak. I couldn't really do anything." K.T. testified that when she awoke the next morning, she was naked and lying on the floor in appellant's bedroom. Appellant told her that she had gotten "so f——d up last night," and that he had had to wash her clothes. Although still impaired, K.T. got dressed and drove to Nunn's house. Nunn drove her to a hospital for a rape exam. Police questioned K.T. about the offense while she was at the hospital.

K.T. testified that she had drunk very little alcohol prior to going to appellant's house, and once she was there, she drank only a sip of one beer and then the vodka shot. K.T. explained that she was not a

heavy drinker, generally, and there was only one time in her life that she could recall drinking as much or more than she drank that night; but she further testified that that amount only made her feel "buzzed," and she did not pass out, vomit, or become incontinent on that occasion.

Defense counsel vigorously cross-examined K.T. about how much alcohol she had drunk, and suggested that K.T. voluntarily drank herself into the incoherent state she was in that evening. Appellant also offered evidence that K.T. had personal reasons to testify falsely about the incident. Specifically, defense counsel questioned K.T.'s motives, implying that K.T. had actually consented to sex with appellant, but later decided to lie so that her on-again, off-again boyfriend, Nunn, would not be angry with her and would "take her back." [4]

Results from the rape exam indicated that appellant was the contributor of semen recovered from K.T.'s vagina. Cannon was ruled out as a contributor. The results of a urinalysis test for gamma hydroxybutyrate (GHB), commonly known as a date-rape drug, was negative. However, at trial, the State offered the testimony of a toxicologist who explained that GHB has a half-life in the body of only twenty minutes to an hour.

Appellant's house was searched, and police recovered the following items: a plastic coke bottle containing GHB; two exposed but undeveloped rolls of film from Diaz's bedroom; one Polaroid photograph depicting K.T. passed-out, unclothed, and lying in the hallway; and three Polaroid close-up shots of her vagina.[5]

---

**4.** Appellant further sought to demonstrate that because K.T. was a stripper, she was the kind of person who would consent to the sex acts performed on her.

**5.** The court of appeals held that the three close-up Polaroid photographs of K.T.'s vagina were not inadmissible. Appellant did not object to the admission of the single Polaroid

The State offered into evidence photographs made from the rolls of undeveloped film in two distinct groups. Except for the one Polaroid photograph of K.T. lying naked on the floor, appellant objected to all of the photographs based on Rules of Evidence 404(b) and 403. The first group, State's exhibits 71 through 76 and 78, included two photographs from the undeveloped rolls of film, which depict an unidentified and unconscious naked woman[6] lying on a couch or a bed. One photograph from this group shows a man placing a bottle or can into this woman's vagina, another shows a close-up of her vagina, and another shows an unidentified man performing oral sex on her.

The second group of photos, State's exhibits 77 and 82 through 97, depict various people in and around appellant's house. One photograph, State's exhibit 95, shows Cannon and two other participants willingly engaging in a sex act and posing for the camera. This photograph, along with State's exhibits 96 & 97, is one in a series of photographs depicting Cannon, another woman (who is clearly conscious), and another man. State's exhibit 95 depicts the naked woman lying on a bed between Cannon and the other man. She has her legs spread for the camera while Cannon and the other man are kissing her neck and face. State's exhibit 96 depicts the same woman and Cannon. Her legs are spread wider, she is smiling at the camera, and she is spreading her labia open with the fingers of one hand. State's exhibit 97 is a

close-up shot of the same woman's vagina. In this photo, she is spreading her labia with both hands. Cannon's knee and the other man's hand are also visible in the background of the photo.

Also within this second group of photos is a photograph of Diaz, which was admitted as State's exhibit 77. He is shown having what appears to be consensual intercourse with an unidentified woman in his bedroom.

Another series of photographs from this second group depicts appellant, Cannon, and Diaz in and outside of appellant's house. Several photographs show Cannon intoxicated, sitting or lying on the ground. In one photograph, he is vomiting on the ground. In another photograph, appellant is "flashing" a gang sign in the kitchen of the house, and in another photograph, he is urinating on the side of the house.

In sum, the State argued primarily that all of the photographs were admissible to connect appellant and Cannon as parties to the instant offense, to show motive, and to rebut appellant's defensive theories that it was K.T. who brought the GHB, voluntarily became intoxicated, and consented to the sexual acts.

The trial judge conducted extensive hearings outside the jury's presence on the admissibility of these photographs. She examined all of the photographs, articulated their relevance and probative value on the record,[7] and allowed the parties to

photograph of K.T. lying naked on the floor of the hallway.

6. There was some discussion outside the presence of the jury about whether the photographs in this group depicted one or two individual females. At some point during the hearing, however, the parties and the court began to refer to all of these photographs as the *one* unconscious woman. It appears to us, however, that the subject of State's exhibit

78 is not the same woman as depicted in State's exhibits 71 through 76.

7. The trial judge carefully examined the photographs:

Well, it appears in some of these photographs that there are a couple of photographs of a female—there's one photograph where you can't tell who the girl is because she's covered up with pillows. There are two photographs, three photographs of a

fully develop their evidentiary arguments.[8] She initially ruled that only some of the photographs were admissible, but toward the end of testimony the next day, the State reoffered the rest[9] and the trial judge admitted them. She noted, *inter alia*, that they tended to show the knowledge and participation of all three men—appellant, Cannon, and Diaz—in this incident as well as the other two incidents.

## Holdings of the Court of Appeals

The court of appeals reversed the trial court's judgment, holding that admission of the photographs from the undeveloped rolls of film violated Rules of Evidence 401, or 404(b), and 403, and that their improper admission was harmful. Specifically, the court of appeals concluded that the trial court erred in admitting the two sets of photographs because "the events

---

female where it appears she is clearly conscious ... In another one she appears to be smiling in the picture, and appears to be doing various [sex] acts. So in those I don't believe the girl is unconscious. They are very different from these where in some of these photographs the position of the arms, which appear to be limp, are in exactly the same position. Where it appears that she's got a Coke or beer can shoved up her vagina. ... And [she is] also exactly in the same position at another time that a male appears to be having oral sex with her. This appears to be a girl who is unconscious. ... They are very different from the other photographs.

Once the trial judge separated these pictures into two categories-one unconscious woman (or perhaps two such women) unaware that she was being photographed while having sex acts performed upon her and a second, conscious woman who appeared to enjoy the sex acts and was aware of being photographed—she noted,

The defensive theory that appears to have been raised in this case through questions that were asked and statements that were made to the complainant on the stand, isn't it a fact that you took the GHB in there. Isn't it a fact you consented to these sexual acts. .... From the context of all these photographs there's an appearance that these are some sort of spectator sport, where one person is having sex and other people are around, at least one other person taking the photographs. ... [I]t appears in the photographs that the—of the two different girls, that the location of the sexual acts that are taking place with both girls appear to be on the same bed. The bedding is the same. ... There are multiple people involved in these situations. At least three different males.

The trial judge then explained that "there is great relevance to at least some of the photo-

graphs" which showed "an unconscious girl being sexually abused" in a manner that was very similar to that shown in the Polaroid photographs of the present incident and other photographs which showed another similar incident except that the girl in those pictures appeared to be conscious and consensually participating in the sex acts. The trial judge noted that Jesse Diaz appeared in the photographs of the unconscious woman and "[t]here's testimony that Jesse Diaz is the one who actually delivered the drug to complainant in this case." She noted that "[t]here are photographs of all three people that were present during this offense, according to the complainant, in this roll of film. And they tend to show the nature of their relationship, a preoccupation or an interest or amusement in seeing people intoxicated or passed out ... which to me is relevant to this."

8. The State emphasized that the "whole defense so far, what the Jury has heard, has been that the complainant must have brought this GHB with her. That's what they have argued. And I expect that later testimony will be that-and it sounds like there's been some kind of consensual sex here. We are entitled under the law to rebut that to show to the Jury that that's not consensual and to show the motivation, the intent, the scheme, the plan, all of those things I think are apparent from the photographs."

9. The State said that the two defendants, appellant and Cannon, had argued that neither of them were involved with the photographs, "so they can then point the finger at Jesse Diaz." Further, the State noted that the defense was arguing that Cannon did not live at the house and was trying to dissociate himself from this "spectator sport, and sexual assault scenario that's going on in this house."

depicted ... did not have any tendency to make the existence of a fact of consequence more or less probable" (citing Rule 404(b)), and they "improperly encouraged the jury to convict appellant on the basis of his ... debauched character." (citing Rule 403). *Casey v. State,* 160 S.W.3d at 226–28.

*Standard of Review*

 When reviewing a trial court's ruling on the admission of evidence, an appellate court applies an abuse of discretion standard of review. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App. 1991) (op. on reh'g). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Green v. State,* 934 S.W.2d 92, 101–102 (Tex.Crim.App.1996).

*Applicable Law*

 Evidence that does not have relevance apart from character conformity is inadmissible. Tex.R. Evid. 404(b). Extraneous-offense evidence is not inadmissible under Rule 404(b) if the extraneous-offense evidence is relevant to a fact of consequence apart from its tendency to show conduct in conformity with character.[10] *Johnston v. State,* 145 S.W.3d 215 (Tex.Crim.App.2004). Extraneous-offense evidence is not inadmissible under Rule 404(b) when it is offered to rebut an affirmative defense or a defensive issue that negates one of the elements of the crime. *Id.; Powell v. State,* 63 S.W.3d 435, 438–440 (Tex.Crim.App.2001).

 Once a trial court rules that uncharged misconduct evidence is not barred under Rule 404(b), the opponent of the evidence may further object under Rule

403. *Santellan v. State,* 939 S.W.2d 155, 169–70 (Tex.Crim.App.1997). Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex.R. Evid. 403. Relevant evidence is generally admissible, but it is properly excluded under Rule 403 when its probative value is substantially outweighed by the danger of unfair prejudice. In keeping with the presumption of admissibility of relevant evidence, trial courts should favor admission in close cases. *Montgomery,* 810 S.W.2d at 389.

 The term "probative value" refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence. *Gigliobianco v. State,* 210 S.W.3d 637, 641 (Tex. Crim.App.2006). When conducting the balancing test under Rule 403, the trial court determines whether the probative value of the evidence is substantially outweighed by one of the following countervailing considerations listed in the rule. *See, e.g., Crank v. State,* 761 S.W.2d 328, 342 n. 5 (Tex.Crim.App.1988), overruled on other grounds by, *Alford v. State,* 866 S.W.2d 619, 624 (Tex.Crim.App.1993).

 "Unfair prejudice" refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. *Gigliobianco,* at 641(citing *Montgomery v. State,* 810 S.W.2d at

---

**10.** The text of Rule 404(b) provides, in pertinent part, as follows. "Other Crimes, Wrongs or Acts.-Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."

389). Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence. *Id.* at 641.

"Confusion of the issues," refers to a tendency to confuse or distract the jury from the main issues in the case. *Id.* at 641. Evidence that consumes an inordinate amount of time to present or answer, for example, might tend to confuse or distract the jury from the main issues. "Misleading the jury," refers to a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds. For example, "scientific" evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence. *Id.* "Undue delay" and "needless presentation of cumulative evidence" concern the efficiency of the trial proceeding rather than the threat of an inaccurate decision. *Id.*

In sum, a trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or repeat evidence already admitted. *Id.* at 641–42.

*Analysis and Holdings*

*State's Exhibits 71 through 76 & 78 and 95 through 97*

Exhibits 71 through 76 and 78 are photographs depicting an unidentified woman (or possibly two different women), who is naked and unconscious. Exhibits 95 through 97 depict another unidentified woman who is naked and clearly conscious.

*Rule of Evidence 404(b)*

We hold that these photographs were not inadmissible under Rule 404 because they had logical relevance apart from character conformity. Appellant and his co-defendant Cannon repeatedly urged the defensive theories of consent and voluntary intoxication,[11] as well as their theory that K.T. fabricated the "sexual assault" story to save her relationship with Nunn, her former boyfriend. The defense also focused upon K.T.'s purportedly low moral character as a stripper, questioning her about whether she wore panties or a G-string as a dancer and whether dancers at topless clubs commonly used GHB. When K.T. denied both having consensual sex and posing for the Polaroid photographs with appellant and Cannon, the defense then rhetorically asked her, "You just dance for a living, you don't consent to photographs."

We have held that when the defensive theory of consent is raised in a prosecution for sexual assault, the defendant necessarily disputes his intent to engage in the alleged conduct without the complainant's consent and places his *intent* to commit sexual assault at issue. *Rubio v. State,* 607 S.W.2d 498, 501 (Tex.Crim.App.1980).

We have also stated that "evidence of a defendant's particular *modus operandi* is a recognized exception to the general rule precluding extraneous offense evidence, if the *modus operandi* evidence tends to prove a material fact at issue, other than propensity." *Owens v. State,* 827 S.W.2d 911, 915 (Tex.Crim.App. 1992). In the context of extraneous of-

---

11. *Elliott v. State,* 858 S.W.2d 478, 485 (Tex. Crim.App.1993).

fenses, *modus operandi* refers to "a defendant's distinctive and idiosyncratic manner of committing criminal acts." *Id.* at 914. Although the *modus operandi* theory of admissibility under Rule 404(b) usually refers to evidence offered to prove the identity of a specific person, its use is not so limited in the law. *Modus operandi* may also encompass the "doctrine of chances" theory to show lack of consent, motive, and the manner of committing an offense. We have recently noted that "evidence of a remarkably similar act might be admissible to prove the *corpus delicti* (the crime itself), intent, or lack of consent under 'the doctrine of chances.'" *Daggett v. State,* 187 S.W.3d 444, 453 n. 18 (Tex.Crim.App.2005); *see also Martin v. State,* 173 S.W.3d 463, 467–68 (Tex. Crim.App.2005) (lack of consent); *Robbins v. State,* 88 S.W.3d 256, 265–69 (Tex.Crim.App.2002)(COCHRAN, J., concurring) (corpus delicti); *Plante v. State,* 692 S.W.2d 487, 491–92 (Tex.Crim.App.1985) (intent).

The State's theory of relevance for offering the photographs of the other unconscious woman was that, because the defense had attacked K.T.'s character and argued that the evening's activities were her idea and that she provided the GHB, it was entitled to show that this was not an isolated event. Instead, "[t]he photographs of the extraneous sexual assault on an apparently unconscious woman in the [appellant's] residence are illustrative of a motive to engage in nonconsensual sexual activity for the purpose of photographing the activity." State's Brief at 13. Although the defensive theory of K.T.'s bad character and her willing participation in this type of sexual encounter and photography might appear plausible on its face, its plausibility diminishes if the same scenario is repeated with other women on other occasions.

Before admitting the photographs, the trial judge noted numerous similarities between the charged incident and that depicted in the photographs of the unconscious woman:

1) the events occurred in the same bedroom on the same bedding in appellant's home;

2) the photographs depicted an unconscious woman being sexually abused;

3) the photographs showed a group of men, one of whom was having sex with the unconscious woman while others are present;

4) the photographs depict a "positioned" unconscious naked woman whose legs have been spread apart;

4) one of the men took photographs of the incident.

K.T. had testified that both appellant and Cannon sexually assaulted her and that both of them took photographs of the assaults. The Polaroid photographs show her "positioned" in the same manner as the other unconscious woman. The trial court used the term "spectator sport" in noting the similarities between the Polaroids of K.T., the photographs of the unconscious woman, and the photographs of the conscious woman who appeared to be enjoying the activities. Two of the women did not appear to be consenting to the activities, while the third—as a contrast—did. Consent versus nonconsent. Drugged versus not drugged. Sexual abuse versus sexual participation. We conclude that the trial judge did not abuse her discretion in finding that the photographs of both the unconscious woman and the conscious woman were relevant for the non-propensity purpose of rebutting the defensive theories that "the stripper" K.T. brought the GHB, initiated the sexual activity, and consented to the photographic depiction of it. *See Martin v. State,* 173 S.W.3d at 466–67; *Gipson v.*

*State,* 619 S.W.2d 169, 170 (Tex.Crim.App. 1981); 1 EDWARD J. IMWINKELRIED, § 5:3 (Rev. ed.2003).; TEX.R. EVID. 404(b). The court of appeals was mistaken in concluding that the photographs "did not have any tendency to make the existence of a fact of consequence in this cause more or less probable." *Casey,* 160 S.W.3d at 228. *See Powell v. State,* 63 S.W.3d at 439; *Gipson,* 619 S.W.2d at 170 (extraneous offenses may be admitted if they are shown to be material and relevant to a contested issue); *Albrecht v. State,* 486 S.W.2d 97, 100 (Tex.Crim.App.1972).

*Rule of Evidence 403*

 We further hold that the probative value of the photographs of the unconscious female (or females) and of the conscious female was not substantially outweighed by the danger of unfair prejudice under Rule 403. The inherent probative force of these exhibits was its tendency to show that K.T. did not consent to the sexual activity. The probative force of the evidence is coupled with the State's need for the evidence, and they are placed on one side of the scale. *Gigliobianco v. State,* at 642.

Whether K.T. consented was the ultimate issue to be established by the parties in the litigation. *See, e.g., Martin,* 173 S.W.3d at 466; *Boutwell v. State,* 719 S.W.2d 164, 179 (Tex.Crim.App.1985) (a successful conviction for sexual offense often depends primarily on whether the jury believes the complainant). Appellant sought to show through extensive argument and testimony that K.T. was a willing participant in the sex act, and thus, no sexual assault could have occurred. Appellant and Cannon offered evidence that K.T. initiated the sexual activity with appellant; that she brought the GHB with her; that she could not remember precisely the events of the evening due to her voluntary intoxication, and if she could re-

member, she was lying to the jury; that she was a stripper, and therefore, she naturally consented; and that her desire to win back the affections of Nunn drove her to falsely accuse appellant and Cannon of non-consensual sex.

State's exhibits 71–76 & 78's probative force centers in their inherent ability to show that it was unlikely that K.T. and at least one other woman were consenting to the sexual activity. *See Johnson v. State,* 68 S.W.3d 644, 651–52 (Tex.Crim.App. 2002); *Wheeler v. State,* 67 S.W.3d 879, 889 (Tex.Crim.App.2002); *Albrecht v. State,* 486 S.W.2d at 100 (before evidence of collateral crimes is admissible, a relationship between such evidence and the evidence necessary to prove that the accused committed the crime for which he stands charged must be shown). Moreover, the record reflects that it was obvious to the trial court that the woman in State's exhibits 71–76 was unconscious and not participating because she was in the same position from frame to frame with her mouth agape, despite having large objects inserted into her vagina and having cunnilingus performed on her. The trial court, thus, explicitly reasoned that these photographs were supportive of a significant fact of consequence—that K.T., like the other woman, was unconscious and did not consent. We conclude that the photographs of the other unconscious woman (or women) were strong evidence that K.T. did not consent on the night in question. We couple this strong probative force with the State's need for the evidence.

K.T. was largely incoherent throughout the evening, and at trial, both appellant and Cannon vigorously challenged her ability to remember the events as they unfolded. For example, in opening argument, Cannon's attorney chided that "the only evidence of sexual contact will come from [K.T.]," "who will tell you in her

drunken stooper [sic] that she recalls something." Thus, the State needed the evidence to counterbalance the various defensive theories advanced throughout the trial. We conclude that the probative value, coupled with the State's need for the evidence, would lead a reasonable trial judge to assign considerable probative weight to the photographs of the unconscious woman or women. *See Gigliobianco v. State,* PD–1878–05, at 642. Similarly, the photographs of the conscious woman are a contrast to those of K.T. and the unconscious woman, but they also demonstrate the *modus operandi* of what the trial judge termed "the spectator sport" of having group sexual activities, both consensual and non-consensual, and photographing them.

The inherent probative value and the State's need for the evidence are then balanced against the Rule 403 counterfactors: the tendency of the evidence to (1) suggest a decision on an improper basis, (2) confuse or distract the jury from the main issues, (3) be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, or (4) consume an inordinate amount of time or repeat evidence already admitted. *See id* at 642.

Appellant complained that these photographs were unfairly prejudicial.[12] Therefore, we shall determine whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403.

Unfair prejudice refers not to an adverse or detrimental effect of evidence but to an undue tendency to suggest a decision on an improper basis, commonly an emotional one. *See Old Chief v. United*

*States,* 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). Unfair prejudice does not arise from the mere fact that evidence injures a party's case. Virtually all evidence that a party offers will be prejudicial to the opponent's case, or the party would not offer it. *Cohn v. State,* 849 S.W.2d 817, 820 (Tex.Crim.App.1993). Evidence is unfairly prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justifies its admission into evidence. *United States v. Figueroa,* 618 F.2d 934 (2d Cir.1980). The prejudicial effect may be created by the tendency of the evidence to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant. *See id.*

The photographs of the naked unconscious woman (or women) having sex acts performed upon them were certainly prejudicial. And it is undisputed that the photographs would generate an emotional response. *See Wheeler,* 67 S.W.3d at 889 (evidence of an extraneous sexual offense will always carry emotional weight and the danger of impressing the jury in an irrational and indelible way). However, the trial judge did not abuse her discretion in declining to find that the risk of unfair prejudice from admission of the photographs substantially outweighed their probative value.

First, these photographs are circumstantial evidence that K.T. did not consent in the instant offense. *See Cohn,* 849 S.W.2d at 820. The photographic evidence showing both an unconscious woman and a contrasting conscious woman tends to corroborate K.T.'s testimony that she, like the other unconscious woman, did not consent to either the sex or the photography. *See id.* Like all corroborating evidence, be-

---

**12.** Although there were extensive hearings on the admissibility of the photographs outside the presence of the jury, the time spent actually presenting the evidence to the jury was very short.

cause it is consistent with the K.T.'s story, it has a tendency to make her testimony more plausible.

Second, the evidence demonstrated a *modus operandi* of group sex, drugs, and photography and rebutted the defensive theory that K.T. brought the drugs, initiated the sex, and consented to the photography. Although this evidence might have been inadmissible under Rule 403 had the defense not put K.T.'s character, motives, recollection, and conduct on trial, once he chose that strategy, the trial judge did not abuse her discretion in permitting the State to rebut it with *modus operandi* evidence. The State had no other means to rebut the defense theories, and this rebuttal evidence was not offered merely to excite emotions against the defendant. *See id.; Wheeler v. State,* 67 S.W.3d at 889 (admission of State's rebuttal testimony of extraneous-offense victim did not offend Rule of Evidence 403).

In *Montgomery v. State,* we explained that "[w]hen the proponent has other compelling or undisputed evidence to establish the proposition or fact that the evidence goes to prove, the [probative value of the evidence] will weigh far less than it otherwise might in the probative-versus-prejudicial balance." 810 S.W.2d at 390. Here, the four Polaroid photographs of K.T. depicting her naked and unconscious, including the close-up shots of her vagina, were not very compelling, standing alone, to show her lack of consent.[13] Likewise, without the benefit of the photographs of

the other women, K.T.'s testimony could have been easily discounted by the jury due to her intoxication and intermittent recollection of the events. The trial judge, who was present in the courtroom, was better able to gauge the tone and tenor of K.T.'s testimony and of the defense cross-examination than are we. As noted above, the trial judge conducted extensive hearings outside the jury's presence concerning the admission of this evidence. Hers was not a hasty or unreflective ruling. Accordingly, we conclude that she did not abuse her discretion in deciding that the probative value of these photographs was not substantially outweighed by the risk of unfair prejudice.

### State's exhibits 77 and 82 through 94

On the other hand, we agree with the court of appeals' ultimate conclusion that State's exhibit 77 (Diaz having sex with an unnamed female) and State's exhibits 82 through 94 (various photographs of Cannon, who appears to be very intoxicated, and two of appellant—one wherein he is urinating on the side of a building, and in another, he is flashing a gang sign) were inadmissible, as they were not supportive of a fact of consequence to the proceedings. *See* Tex.R. Evid. 401, 402; *Casey,* 160 S.W.3d at 228. The State argued that these photographs were admissible to show the continuity of the timeframe in which the other photographs on the two rolls of film were taken, but the probative value of demonstrating the timeframe is substantially outweighed by the

---

13. Through cross-examination, appellant challenged K.T.'s ability to identify herself in State's exhibits 13 through 15, which as noted above, where close-up shots depicting her genital area only. The questioning proceeded as follows:

Defense counsel: The truth is that the only reasons you can recognize that those foggy photos of someone's—between someone's legs is because you posed for them and y'all

laughed and joked about them, isn't that right?

K.T.: No.

Defense counsel: They were lousy photographs, weren't they?

K.T.: [non-responsive answer]

Defense counsel: Unless of course you were consenting and laughing and joking about it, right?

risk of unfair prejudice of admitting otherwise irrelevant photographs. However, we conclude that the admission of these photographs was harmless.

■ Texas Rule of Appellate Procedure 44.2(b) provides that an appellate court must disregard a non-constitutional error that does not affect a criminal defendant's "substantial rights." Under that rule, an appellate court may not reverse for non-constitutional error if the court, after examining the record as a whole, has fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. See Garcia v. State, 126 S.W.3d 921, 927 & n. 9 (Tex.Crim.App.2004) (noting adoption of federal non-constitutional error standard as explained in Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

■ After examining the record of appellant's trial as a whole, we have fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. First, the photographs of Cannon, appellant, and Diaz "partying" were not scandalous or shocking, but, were innocuous in comparison to both the photographs of K.T. and those of the other women. Second, except for one comment during closing argument, the State did not emphasize the evidence. There was no mention of gang affiliation or alcohol addiction; instead, the State's sole comment was directed at showing that appellant and Cannon acted together, a strategy that obviously failed, as the jury acquitted Cannon. Third, there was very little contemporaneous testimony concerning the photographs when they were admitted into evidence. Fourth, this jury was manifestly able to consider the probative evidence and separate it from marginally relevant evidence because it did acquit Cannon and convicted

appellant of the lesser-included offense of sexual assault rather than the charged offense of aggravated sexual assault. We therefore conclude that the erroneous admission of State's exhibits 77 and 82 through 94 was harmless error under Tex. R.App. P. 44.2(b).

## II.

■ The court of appeals further held that the use of the word "victim" in the jury charge constituted an impermissible and harmful comment on the weight of the evidence. Casey v. State, 160 S.W.3d at 230. Defense counsel objected to the use of the word "victim" in the charge. The conference on the charge proceeded, in pertinent part, as follows:

Counsel: Judge, I've got an objection to the Charge. .... [T]he use of the word victim, I think is a misapplication.

\* \* \* \* \* \*

The Court: That's what the Code says. The victim of the offense is something they will have to decide.

Co-counsel: I think there's case law, I'm not sure exactly what it is. I'm not-that's an impermissible comment on the evidence.

Counsel: On Page 3. Judge, 3, says to the victim of the offense.

The Court: Which is what the Indictment says.

Counsel: That specifically is calling her a victim. I think that's an impermissible comment to the Jury.

The Court: Now, if you find from the evidence beyond a reasonable doubt, that's something they have to find. David Casey, alone or as a party knowing, knowingly or intentionally—okay. 2201 aggravated sexual assault uses the word victim of the offense. On page 1, that's all that's doing is

giving them the law. That's not—you know and you have to quote from the law to give them the law. I mean I can't substitute my choice of a word for what the Legislature picked. Now, the Indictment—I mean the State's got to prove what's in there. And I don't think I can give them some other burden. And all the Indictment is doing is tracking the wording of the statute. That's overruled.

Counsel: Judge, just to make sure I've got the objection stated right, on Page 3 where it says [K.T.] is the victim of the offense, by designating her as a victim it is our position the Court is instructing the Jury as a matter of law that she is a victim and impermissibly commenting on the weight and we object to the use of that terminology.

The Court: That—this is the application paragraph that we are talking about on page 3 and of course—and it will be the same in the other charge, I believe. Now, if you find from the evidence beyond a reasonable doubt, and it's followed by unless you so find beyond a reasonable doubt or if you have a reasonable doubt thereof you will acquit the Defendant of aggravated sexual assault and next consider the lesser included offense of sexual assault. That being the application paragraph, that being the allegation which does track the statute that is set out by the State in the Indictment, the Court—well, I can't change the wording of the Indictment.

Counsel: And it is our position that you can simply put [K.T.] with intent of facilitating without designating her and identifying her.

The Court: The law says you have to prove she is the victim of the offense.

And so the State's got to prove that. I can't remove an element of proof.

Co–Counsel: Can we put in the alleged victim, include the word alleged?

The Court: No, because the whole wording of the paragraph says that that's what the State's got to prove. I would be amending—no, I can't do that. That's got—the application paragraph has got to track the Indictment.

The application portion of the jury charge read as follows:

Now if you find from the evidence beyond a reasonable doubt that … [appellant], acting alone or as a party, did … knowingly or intentionally cause penetration of the female sexual organ of [K.T.], without the consent of [K.T.], by … the sexual organ of [appellant], and [appellant], acting alone or as a party, did administer or provide a drug, namely: [GHB] to [K. T.], the victim of the offense, with the intent of facilitating the commission of the offense, then you will find the defendant guilty of aggravated sexual assault, as charged in the indictment.

Texas Penal Code section 22.021(a)(1)(A)(i),(2)(A)(vi) provides that a person commits aggravated sexual assault if he "administers or provides flunitrazepam, otherwise known as rohypnol, [GHB], or ketamine to *the victim of the offense* with the intent of facilitating the commission of the offense." (emphasis added). Accordingly, the Penal Code requires that the State prove that the intoxicant was administered to a "victim."

Article 36.14 of the Code of Criminal Procedure requires that a trial court provide a jury charge "distinctly setting forth the law applicable to the case." TEX.CODE CRIM. PROC. art 36.14 (Vernon Supp.2006–2007). The charge here set forth the law applicable to the case by tracking the lan-

guage of the statute. *See Watts v. State,* 99 S.W.3d 604, 607, 612 (Tex.Crim.App. 2003); *Chambers v. State,* 700 S.W.2d 597, 599 (Tex.Crim.App.1985). Moreover, we are not persuaded that the charge as written "assume[d] the truth of a controverted issue," *see Whaley v. State,* 717 S.W.2d 26, 32 (Tex.Crim.App.1986), or that the appearance of the word "victim" in the charge without the modifier "alleged" is a comment by the trial court which assumes the truth of a controverted issue—the issue of consent. *Cf. Veteto v. State,* 8 S.W.3d 805, 817 (Tex.App.-Waco 2000, pet. ref'd) (charge containing extra-statutory language construed as a comment on the weight of the evidence). The cases cited and relied upon by the court of appeals to reverse the conviction for jury charge error are inapposite to the case at hand, and therefore, we see no need to discuss them at length.

Because the jury charge tracked the language of the statute, the trial court did not abuse its discretion by including the word "victim" in the charge. *See Woods v. State,* 152 S.W.3d 105, 115 (Tex.Crim.App. 2004). We decline appellant's invitation to act as a super-legislature and rewrite this section of the Penal Code.

### III.

We reverse the judgment of the court of appeals. We remand the cause to the court of appeals to address appellant's remaining points of error.

PRICE, J., dissented.