Phillip Abel HERNANDEZ, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 01–09–00631–CR, 01–09–00632–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

March 17, 2011.

Don R. Cantrell, Attorney at Law, Richard Keith Oliver, Houston, TX, for Appellant.

Michelle Ruth Townsend, Houston, TX, for Appellee.

Panel consists of Justices KEYES, SHARP, and MASSENGALE.

## OPINION

MICHAEL MASSENGALE, Justice.

A jury convicted appellant Phillip Abel Hernandez of indecency with a child (trial court case no. 1066022; appellate court case no. 01–09–00631–CR) and of aggravated sexual assault of a child under 14 years old (trial court case no. 1066023; appellate court case no. 01–09–00632–CR). *See* TEX. PENAL CODE ANN. §§ 21.11, 22.021 (West Supp. 2010). The trial court assessed punishment at 15 years in prison on each conviction, to run concurrently. On appeal, Hernandez brings one issue relevant to both convictions. Though he made no objection at trial, he argues now on appeal that the trial court's response to a question posed by the jury during its deliberations was a comment on the weight of the evidence and improperly lowered the State's burden of proof. We conclude that the trial court's instruction was erroneous because it was a comment on the

weight of the evidence, but in light of the entire record, we conclude that Hernandez was not deprived of a fair and impartial trial. Because we find no egregious harm, we affirm the trial court's judgment.

## I. Factual background

Hernandez was accused of sexually assaulting his daughter, C.H., on two occasions before her fourteenth birthday. C.H. testified that the first incident occurred when she was in the fifth grade. C.H.'s family was temporarily living with her aunt because Hernandez was unemployed. At that time, C.H. and her younger brother shared a bedroom with their parents. Ordinarily, C.H.'s parents slept in the bed, and C.H. and her brother slept on pallets on the floor beside the bed. At trial, C.H. drew a diagram of the room, showing the orientation of the door, window, furniture, and where she and her brother slept. C.H. testified that she woke early one morning when she felt a man lying beside her. C.H. said she could tell it was a man because of his big hands. She recalled the time of day because she remembered the sun coming up from the window. She testified that she was lying on her side, and the man was lying beside her, his front touching her back. C.H. testified that she knew it was her father and not her younger brother by the size of the man's hands and because she later turned and saw him. She said that Hernandez put his hand under her shirt and began rubbing her breasts. Then he put his hand inside her underwear and rubbed the outside of her vagina. She testified that she was confused and scared, so she kept her eyes closed and pretended to sleep, hoping that her mother, who was sleeping in the bed nearby, would wake up.

C.H. alleged that the second incident occurred when she was in the seventh grade. Her parents had been separated

for several months, during which time the children lived with their mother. When the parents reconciled, they moved into an apartment together. C.H. testified that she was home alone with Hernandez, while her brother was with a relative who lived nearby. She said that her father had been assembling bunk beds upstairs while she watched television downstairs in the living room. When her father came downstairs, they began to wrestle playfully. C.H. recalled that she was wearing a black skirt and a pink and black top and that she ended up sitting on top of his stomach.

While she was straddling his stomach, he commented on how much she had grown during the preceding months when he had not seen her. He then put his hands under her shirt and began rubbing her breasts. C.H. testified that he stopped when she told him to stop, but he then started trying to put his hands up her skirt. She testified that when she ran from him, he told her to go into the downstairs bathroom, and she resisted. She said, "I was scared. I knew what he was going to do to me in there." She either elbowed him or kicked in the stomach, and "that's when he let go of me and I ran upstairs to my room." In her room, she changed into pajama pants and watched television. Soon thereafter, Hernandez came to her room, grabbed her arms from behind, forced her to her knees, pulled down her pants and underwear, and put his fingers in her vagina. She testified that she knew his fingers were there because she "could feel the long nails," and it hurt. She ran to the bathroom and cried. C.H. said Hernandez later apologized and said that "he wouldn't do it again unless I told him to ... touch me."

A couple of weeks later, Hernandez threatened to spank C.H. with a belt because she had been fighting with her brother. C.H. ran from Hernandez and told her mother that he had touched her. C.H. testified that she was afraid her mother would not believe her, but that she "didn't think he had the right to punish [her] ... after what he did." Her mother never called the police or child protective services.

Approximately one year later, C.H. and her younger brother evacuated with their maternal grandparents when Houston was threatened by Hurricane Rita. C.H. stayed with relatives at a cabin while her parents remained behind in Houston. One night while evacuated from Houston, C.H.'s adult half-brother noticed her sitting alone outside, crying. He repeatedly asked her what was wrong. Eventually, she told him that her father had touched her, and she told him not to tell anyone because she was embarrassed. At trial, her brother testified that C.H. cried, avoided eye contact, and appeared embarrassed when she spoke to him. He told his uncle about the disclosure, and the uncle told his wife, C.H.'s Aunt Romana.

The next morning, C.H. came to Romana's bedroom. Romana, who had been designated as the outcry witness, testified that she knew something was wrong based on C.H.'s demeanor and asked if she was okay. C.H. began crying and shaking, and Romana reassured her that anything that happened was not her fault. Romana testified that C.H. kept asking, "Why?" and "How could he hurt me like this?" Romana said that C.H. told her Hernandez came into her room, pulled down her pants, and put his fingers inside her vagina. Romana testified that C.H. said that she then locked herself in the bathroom and that Hernandez later apologized and promised never to do it again unless she "wanted him to." Romana asked if this was the first time Hernandez had done anything like this, and C.H. then told her about the first incident. She told Romana that while

sleeping in the same bedroom at her aunt's house, Hernandez lay down beside her and fondled her breasts and vagina while she pretended to sleep.

C.H.'s relatives contacted her mother, who made Hernandez leave the home. The police were contacted, and the charges that are the subject of this appeal were brought against Hernandez.

## II. Procedural background

During voir dire, the court explained to the venire panel the State's burden of proof and the defendant's presumption of innocence. The State questioned the venire panel about the likelihood that a perpetrator would commit a crime in front of eyewitnesses and whether the jury could convict on the testimony of a single witness.

> State: Now, the law says that if I prove my case beyond a reasonable doubt with only one eyewitness, then what's the verdict?
>
> Venireperson: Guilty.
>
> State: Come on?
>
> Venire: Guilty.
>
> State: Guilty. Does the law tell me who that witness has to be?
>
> Venire: No.

The defense did not object to any of the State's voir dire questions about convicting on the testimony of a single witness, and Hernandez does not challenge this line of questioning on appeal.

In addition to the testimony of C.H., her older half-brother, and her aunt, the State presented testimony from Claudia Mullin, the forensic interviewer who interviewed C.H. at the Harris County Children's Assessment Center, and Dr. Reena Isaac, who conducted a physical and ano-genital examination.

Mullin initially testified about her training and experience in conducting forensic interviews, noting that she had conducted thousands of such interviews. C.H. was 13 years old at the time of the interview and "developmentally on target." Mullin said that children who have been abused on more than one occasion often have difficulty pinpointing the date or time frame when the abuse occurred. She said she would not be surprised if the child were wrong by a year or two as to the date when the abuse occurred.

Based on her training and experience, the judge permitted Mullin to testify generally about reasons why a person would delay making an outcry of abuse, such as being in a state of shock or wondering if other people will believe the allegations. Mullin testified without objection that she found plausibility, consistency, appropriate language, and sensory details in C.H.'s statements during her interview. For example, C.H. was tearful during the outcry portion of her interview, and she provided many sensory clues.

Dr. Isaac testified that she performed a complete physical examination of C.H. at the Children's Assessment Center. This examination was done nearly six months after Mullin's interview. C.H. provided the social history, telling Dr. Isaac about both instances of sexual abuse that she alleged against her father. Dr. Isaac said that C.H. was cooperative, anxious, and tearful during the interview part of the examination. She noted that C.H. had thoughts of hurting herself but no plan to carry out a suicidal thought. Dr. Isaac testified that she found nothing abnormal in C.H.'s examination. However, she also testified that a normal examination does not necessarily rule out the possibility of sexual abuse.

Hernandez testified in his own defense, denying having molested or sexually assaulted C.H., and controverting certain de-

tails of her accounts. First, he disputed C.H.'s depiction of the bedroom the family shared when she was in fifth grade. According to Hernandez's description, he would have had to crawl over C.H.'s mother to get out of the bed when she was sleeping. He also testified that C.H.'s mother was a light sleeper and she would have woken up if he crawled over her. He said he never had lain down beside C.H. when they slept in that bedroom. He also testified that he and all his children habitually bite their nails.

Hernandez testified that after his separation from C.H.'s mother, they reunited and moved into an apartment with their children. He noticed changes in C.H.'s behavior and demeanor: she fought with her brother, she argued with her mother, and she was generally disrespectful and argumentative. One day, while Hernandez and C.H.'s mother were napping, C.H. fought with her brother in the living room. The mother confronted the children, and when Hernandez came into the living room, he saw C.H. threatening to punch her mother. Hernandez said that he got his belt, and he was going to spank her for trying to hit her mother. C.H. ran upstairs and hid under the bathroom sink. Hernandez said that he "hit her with the belt a couple of times to see if she would get out but she didn't get out, she just kept screaming and screaming." C.H. ran downstairs, and when Hernandez followed, he saw C.H. and her mother talking and crying. The mother yelled and asked if C.H.'s allegations were true. Hernandez testified that he believed C.H. fabricated the allegations against him because she was angry that he tried to spank her. On cross-examination, he conceded that although he had spanked C.H. with a belt in the past, she did not accuse him of sexual abuse after those spankings. He acknowledged that C.H. had told the truth about their living with her aunt when he was out of work, and that C.H. got excellent marks for behavior during the time frame when he contends she behaved badly at home.

Hernandez's final witness was his older daughter, Samantha. She testified that he was a loving father whom she saw every other weekend and some holidays as a child. She said that he never behaved inappropriately toward her and that bites his nails and keeps them very short.

■ After the close of evidence, the trial court instructed the jury as to the relevant law. The jury charges included instructions about the presumption of innocence, the State's burden of proof, and the jury's role as factfinder:

All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that he has been arrested, confined, or indicted for, or otherwise charged with the offense gives rise to no inference of guilt at his trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant.

. . .

You are the exclusive judges of the facts proved, of the credibility of the witnesses and the weight to be given their testimony, but the law you shall

receive in these written instructions, and you must be governed thereby.

During their deliberations, the jurors sent a note to the trial court stating:

> Voir Dire
>
> We need the piece of law regarding the "single witness" as it pertains to evidence. Basically, what the law says.

The trial court responded in writing:

> A conviction is supportable on the uncorroborated testimony of the victim of the sexual offense *if* you believe the witness beyond a reasonable doubt.

There is no record of any discussion by the trial court and counsel of the jury's note. The response returned by the trial court does not indicate whether counsel approved of the response. There is no record that Hernandez objected to this instruction, and on appeal, he concedes that he did not.

The jury returned guilty verdicts on both counts, and the trial court assessed punishment. Hernandez appealed, arguing that the trial court's response to the jury's question commented on the weight of the evidence, improperly lowered the State's burden of proof, and deprived him of a fair and impartial trial.

## III. Analysis

■ A trial court's substantive answer to a jury question during deliberations is considered an additional or supplemental instruction to the jury that is governed by the requirements of article 36.14 of the Code of Criminal Procedure. *Daniell v. State,* 848 S.W.2d 145, 147 (Tex.Crim.App. 1993); *see Guajardo v. State,* 176 S.W.3d 402, 405 (Tex.App.-Houston [1st Dist.] 2004, pet. ref'd). Article 36.14 requires that the trial court deliver to the jury a "written charge distinctly setting forth the law applicable to the case; not expressing any opinion as to the weight of the evi-

dence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." TEX.CODE CRIM. PROC. ANN. art. 36.14 (West 2007). "A charge that assumes the truth of a controverted issue is a comment on the weight of the evidence and is erroneous." *Whaley v. State,* 717 S.W.2d 26, 32 (Tex.Crim.App.1986); *see also Grady v. State,* 634 S.W.2d 316, 317 (Tex.Crim.App. 1982) (observing that "trial court in its charge to a jury should never give the jury an instruction which constitutes a comment by the court on the elements of the alleged offense, or assumes a disputed fact").

### a. Standard of review

■ We employ a two-step process to review allegations of jury-charge error. First, we determine whether error exists in the charge. *Ngo v. State,* 175 S.W.3d 738, 744 (Tex.Crim.App.2005). Our review should not be limited to just one part of the charge standing alone. *Selvage v. State,* 680 S.W.2d 17, 20 (Tex.Crim.App. 1984); *Ybarra v. State,* 890 S.W.2d 98, 106 (Tex.App.-San Antonio 1994, pet. ref'd). The meaning of a jury charge "should be taken from the whole charge, not just from a certain few instructions read in isolation." *Plata v. State,* 926 S.W.2d 300, 302 (Tex.Crim.App.1996), *overruled on other grounds by Malik v. State,* 953 S.W.2d 234 (Tex.Crim.App.1997).

■ If there is error, we then proceed to review the record to determine whether sufficient harm was caused by the error to require reversal of conviction. *Id.* When an appellant claims that a jury-charge error violated a constitutional right, but he has failed to preserve the error, article 36.19 of the Texas Code of Criminal Procedure sets out the applicable standard of review. *Hutch v. State,* 922 S.W.2d 166, 170 (Tex.Crim.App.1996). That article

provides in part that "the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial." TEX.CODE CRIM. PROC. ANN. art. 36.19 (West 2006). Thus, when the defendant fails to object or states he has no objection to the charge, the court will not reverse for charge error unless the record shows egregious harm to the defendant. *Ngo*, 175 S.W.3d at 743–44.

**b. Review of jury charge**

In its reply to the jury's note asking for "the piece of law regarding the 'single witness' as it pertains to evidence," the trial court stated: "A conviction is supportable on the uncorroborated testimony of the victim of the sexual offense if you believe the witness beyond a reasonable doubt." The State relies upon *Casey v. State*, 215 S.W.3d 870 (Tex.Crim.App. 2007), and argues that the instruction was proper despite the reference to a "victim" because it tracked article 38.07 of the Code of Criminal Procedure * and therefore was a correct statement of law. We conclude that *Casey* is distinguishable from this case for two reasons—the statute tracked by the court's instruction was not relevant law in this trial, and the "victim" reference assumed the truth of the key contested issue.

As a general proposition, a jury charge that tracks the language of the relevant statute is sufficient and therefore not erroneous. *See Casey*, 215 S.W.3d at 886–87; *Martinez v. State*, 924 S.W.2d 693, 699 (Tex.Crim.App.1996); *Riddle v. State*, 888 S.W.2d 1, 8 (Tex.Crim.App.1994) ("A jury charge which tracks the language of a particular statute is a proper charge on the statutory issue."). But article 38.07, titled "Testimony in Corroboration of Victim of Sexual Offense," was not a relevant statute for purposes of instructing the jury because it was inapplicable to this case. The provision "allows a conviction for a sexual offense to rest on the uncorroborated testimony of the victim only if there is evidence that she made an outcry to some person other than the defendant within six months of the offense." *Scoggan v. State*, 799 S.W.2d 679, 680–81 (Tex. Crim.App.1990). Historically, the "corroboration or outcry" requirements of article 38.07 did not apply to child victims of sexual assaults who could never be accomplice witnesses to the crime because of their inability to give legally operative consent to sexual intercourse. *See id.* (citing *Hernandez v. State*, 651 S.W.2d 746, 751–53 (Tex.Crim.App.1983) (opinion on rehearing adopting original concurring opinion as majority opinion)). Moreover, the plain language of the statute exempts from its requirements a complainant who, as in

---

* Article 38.07 of the Code of Criminal Procedure provides:

Testimony in Corroboration of Victim of Sexual Offense

(a) A conviction under Chapter 21 [sexual offenses], Section 22.011 [sexual assault], or Section 22.021 [aggravated sexual assault], Penal Code, is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person other than the defendant, of the alleged offense within six months after the date on which the offense is alleged to have occurred.

(b) The requirement that the victim inform another person of an alleged offense does not apply if at the time of the alleged offense the victim was a person:

(1) 17 years of age or younger;

(2) 65 years of age or older; or

(3) 18 years of age or older who by reason of age or physical or mental disease, defect, or injury was substantially unable to satisfy the person's need for food, shelter, medical care, or protection from harm.

TEX.CODE CRIM. PROC. ANN. art. 38.07 (West 2005).

this case, is 17 years old or younger at the time of the offense. *See* TEX.CODE CRIM. PROC. ANN. art. 38.07(b)(1) (West 2005). Thus, although the trial court's instruction to the jury was a correct statement of the law insofar as it correctly mirrored a provision of the Code of Criminal Procedure, it nevertheless did not apply to this case and therefore was not the relevant law for purposes of charging the jury in this case.

In addition to approving the use of language directly tracking the relevant statute, the Court of Criminal Appeals in *Casey* also noted that it was "not persuaded that the charge as written 'assume[d] the truth of a controverted issue,' or that the appearance of the word 'victim' in the charge without the modifier 'alleged' is a comment by the trial court which assumes the truth of a controverted issue—the issue of consent." *Casey*, 215 S.W.3d at 887. As noted previously by this Court in another case involving a jury instruction based upon article 38.07:

> It appears that the Court of Criminal Appeals drew a distinction between the Penal Code provision at issue in *Casey* and the Code of Criminal Procedure provision at issue here. In *Casey*, the Penal Code provision from which the jury charge language was taken describes an aggravating factor that elevates a crime from sexual assault to aggravated sexual assault if the defendant administered a date-rape drug "to the victim of the offense with the intent of facilitating the commission of the offense." TEX. PENAL CODE ANN. § 22.021(2)(A)(vi) (West Supp. 2008). The date-rape drug language forms the second of two prongs of the statute, the first being that a sexual assault occurred. The "victim" language in *Casey* did not assume the truth of a contested issue because, in order to reach the "victim" language, the jury in *Casey* had to

have found that the complainant was indeed a victim of sexual assault.

*Bratcher v. State*, No. 01–08–00610–CR, 2009 WL 1331344, at *11 (Tex.App.-Houston [1st Dist.] May 14, 2009, pet. ref'd) (not designated for publication). In contrast to *Casey*, the reference to "victim" in this case did embrace a contested issue— whether C.H. was a "victim" of actions allegedly committed by Hernandez, and thus whether those alleged actions constituted a "sexual offense."

The language used by the trial court to respond to the jury's question, at least when considered in isolation, assumed the premises that the complainant was a victim and that a sexual offense was committed. Accordingly, to the extent this aspect of the jury instructions assumed the truth of a controverted issue, it was a erroneous comment on the weight of the evidence. *See id.; see also Talkington v. State*, 682 S.W.2d 674, 674–75 (Tex.App.-Eastland 1984, pet. ref'd) (jury charge reference to "victim" in rape case was improper comment on weight of evidence because there was no dispute that sexual intercourse had occurred and sole issue whether it was consensual and the complaint was truly a "victim"); *accord Veteto v. State*, 8 S.W.3d 805 (Tex.App.-Waco 2000, pet. ref'd); *Hernandez v. State*, No. 03–03–00758–CR, 2004 WL 2110396, at *5–6 (Tex.App.-Austin Sept. 23, 2004, no pet.) (not designated for publication).

We conclude that the trial court erred by commenting on the weight of the evidence. *See Whaley*, 717 S.W.2d at 32. Because we hold that the trial court erred by commenting on the weight of the evidence, we need not address whether the same statements were also erroneous because they were nonresponsive. We now turn to our harm analysis and consider, among other things, Hernandez's argu-

ment that the trial court's error improperly lowered the State's burden of proof.

### c. Harm analysis

 Having found error, because there was no objection at trial we must analyze the error for egregious harm, which exists when a court determines that "the case for conviction or punishment was actually made clearly and significantly more persuasive by the error." *Saunders v. State*, 817 S.W.2d 688, 692 (Tex.Crim. App.1991). The purpose behind this analysis is to show whether any jury charge error has actually—not merely theoretically—harmed the accused. *Almanza v. State*, 686 S.W.2d 157, 174 (Tex.Crim.App. 1984). The actual degree of harm must be evaluated in light of: (1) the entire jury charge; (2) the state of the evidence, including the contested issues and the weight of the probative evidence; (3) the final arguments of the parties; and (4) any other relevant information revealed by the trial record as a whole. *Allen v. State*, 253 S.W.3d 260, 264 (Tex.Crim.App.2008). A jury-charge error harms a defendant egregiously if it affects the "very basis" of a case and "deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id.*

1. ***Jury charge.*** Before the jury began its deliberations, the trial court instructed the jury on each of the two charged offenses. In its jury charges, the trial court instructed the jury on the presumption of innocence and the necessity to acquit the defendant unless the prosecution has proved "each and every element of the offense charged beyond a reasonable doubt." The charges included application paragraphs properly applying the law to the facts of the case. These charges did not use the word "victim." The application paragraphs referred to C.H. by her name, and although it was clear from context that C.H. was the al-

leged "victim" of sexual assault, the instruction the trial court gave the jury in response to its note was given in the abstract and did not apply the law in relation to this case. The trial court's response to the jury's question must be reviewed in the context of the entirety of the court's charge. *See Plata*, 926 S.W.2d at 302. Viewed in this context, although the supplemental instruction improperly referred to the complainant as "victim," it did not override or contradict the other parts of the charge that correctly instructed the jury as to the presumption of evidence and the burden to prove all elements of the charged offenses beyond a reasonable doubt.

2. ***State of the evidence.*** This was not a two-witness case—the jury was not put to the task of choosing to believe only C.H. or only Hernandez. The State brought forth other witnesses and circumstantial evidence that corroborated C.H.'s testimony. The State introduced C.H.'s detailed testimony and the video recording of her interview at the Children's Assessment Center. In addition, the State presented C.H.'s brother, who testified that he found her crying and alone and that she told him her father had inappropriately touched her. The State also presented C.H.'s aunt Romana, who testified about what C.H. told her as an outcry witness. Finally, the State introduced Mullin, the forensic interviewer, and Dr. Isaac, the examining doctor. Each witness testified that C.H. had repeated her allegations and each witness described the allegations to the jury, who was able to determine how consistent C.H.'s story remained. In addition, C.H.'s brother, aunt, Mullin, and Dr. Isaac all testified about how tearful and upset C.H. was when describing the alleged sexual assaults. Dr. Isaac testified that C.H. wanted to harm herself.

Hernandez provided controverting evidence about the location of furniture in the family's shared bedroom and the length of his fingernails. He denied the allegations. However, he conceded that C.H. was telling the truth about some of her testimony and his story about getting his belt to spank her for fighting with her brother was consistent with C.H.'s account of what happened the day she first told her mother that her father had assaulted her. Moreover, Hernandez's testimony that C.H. had exhibited behavior problems at home was juxtaposed with evidence that she received excellent marks for her behavior at school during the same time frame.

Hernandez argues that the trial court's response to the jury's question invited the jury to disregard all discrepancies in C.H.'s story as told to the various witnesses. Romana's testimony arguably conflicted with C.H.'s, and Hernandez contends that the trial court's instruction precluded the jury from finding reasonable doubt based on this conflict. In particular, Hernandez argues that C.H. testified that he assaulted her while she was on her knees, but Romana testified that C.H. told her that Hernandez was sitting on the edge of her bed when he assaulted her. While such an alleged inconsistency was relevant to the jury's determination of C.H.'s credibility, the jury was not required to resolve such details in order to convict Hernandez. Ultimately, the trial court's instruction did not invite the jury to disregard inconsistencies that went C.H.'s credibility. To the contrary, in order to convict the instructions expressly required the jury to believe C.H.'s testimony on the elements of the charged offenses beyond a reasonable doubt.

**3. *Arguments of counsel.*** During its closing arguments, the State referred to the voir dire questions about the one-witness rule. The prosecutor reminded the jury, "[E]ach and every one of you promised me that if you believed the child, the evidence would demand a guilty verdict." The State, however, did not focus its closing on this argument. Rather, the State's closing arguments summarized the evidence and urged the jury to conclude that C.H. was credible and to return a guilty verdict. Importantly, the State's closing arguments preceded the error identified by Hernandez's appeal, which occurred after the presentation of all evidence and the final arguments of counsel. There was no opportunity for the State to present any argument capitalizing on or exacerbating the effect of the trial court's error. Accordingly, the arguments of counsel did not cause the erroneous instruction to become egregious.

**4. *Other relevant information.*** Finally, we note that the State discussed the so-called one-witness rule with the venire panel during voir dire and reminded the jury about it during closing arguments. Hernandez did not object in either instance.

\* \* \*

Based on the entire record, we conclude that the trial court's error did not deprive Hernandez of a fair and impartial trial. Because we consider the jury charge as a whole, we conclude that the additional instruction, which required the jury to believe C.H. beyond a reasonable doubt, did not lower the State's burden of proof, when read in conjunction with the application paragraph that required the jury to find every element of the offense proven beyond a reasonable doubt. The verdict was supported by C.H.'s direct testimony, circumstantial evidence supporting C.H.'s credibility—including her demeanor, thoughts of harming herself after the assaults, sensory details provided in her story—and the consistency of her story. The error was not exacerbated by arguments

of counsel, because it occurred after closing arguments. Hernandez did not object to other instances in which the State talked about the so-called one-witness rule. Having considered all of these factors, we cannot say that the trial court's error actually made the case clearly and significantly more persuasive. *See Saunders,* 817 S.W.2d at 692. We overrule Hernandez's issue.

### Conclusion

We affirm the judgments of the trial court.

Justice SHARP, dissenting.

JIM SHARP, Justice, dissenting.

There are times during the course of jury trials that the actions or statements of witnesses, attorneys, or jurors may threaten a fair trial and the presiding judge must carefully instruct the jury to disregard the action or statement so as not to prejudice the proceedings.

When, however, the "skunk in the box" is of the judge's very own doing, the notion that all is somehow deodorized or counterbalanced by the boilerplate language of the court's charge is a hope too far.

Absent the trial judge's comment on the evidence, there would be no doubt this defendant received a fair and impartial trial. I cannot, however, consider the judge's error in this instance as harmless. In fact, the response to the jury's specific inquiry seeking the law on a "single witness" case not only tracked the language of an inapplicable statute but bolstered the victimization of the complainant. Such a written response from the presiding judge cannot be realistically thought **not** to impermissibly color a jury's decision.

The court's charge and the judge's note are to be read and evaluated *en toto.* To expect, however, that a jury will not ascribe a greater weight to the judge's own written answer to its specific question (which the majority correctly holds was a comment on the weight of the evidence) than it does to the charge may be a laudable aspiration, but as a practical matter played out in a courtroom in real time is simply not realistic.

I dissent.