# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00313-CR

**Cory Shane Harris, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT NO. D-1-DC-08-900015, HONORABLE BOB PERKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Cory Shane Harris guilty of sexual assault, *see* Tex. Penal Code Ann. § 22.011 (West Supp. 2008), and assessed punishment at seven years' imprisonment. Harris had previously rejected a plea bargain offer of five years' probation. On appeal, Harris argues that his decision to reject that offer and proceed to trial was involuntary because the trial court and trial counsel provided erroneous advice regarding his parole eligibility and because trial counsel gave him erroneous advice about the admissibility of extraneous-offense evidence. We affirm the judgment of the trial court.

## BACKGROUND

*The Events of November 21-22, 2007*

On the evening of November 21, 2007, Harris and C.B. went out together to several bars in Austin, Texas. Both Harris and C.B. drank alcoholic beverages throughout the evening.

Early in the morning on November 22, C.B. drove them back to the duplex where Harris was staying. They went inside to watch a movie together. During the movie, they began making out. Harris and C.B. got undressed, Harris put on a condom, and the two began having sexual intercourse.

It is uncontested that the intercourse started out as consensual. However, C.B. testified that, after about five or ten minutes, Harris took his condom off. At that point, according to C.B., she told Harris that she did not want to continue having sex:

| | |
|---|---|
| The State: | So when you saw him taking the condom off, what did you do? Did you say anything? |
| C.B.: | I told him I didn't want to anymore. |
| The State: | And did you tell him—how did he respond to that? |
| C.B.: | He said, I'll put it back on, I'll put it back on. |
| The State: | And did he? |
| C.B.: | I have no idea. |
| The State: | Did you want to continue at that point? |
| C.B.: | No. |
| The State: | Did you tell him that? |
| C.B.: | Yes. |

C.B. testified that she was crying and told him to stop several times but that Harris "didn't care. He just kept going." According to C.B., she was unable to make Harris stop because he was significantly larger than her. Harris turned C.B. over and held her down and continued to penetrate her. When he turned her back over and again resumed penetrating her, C.B. tried to get him to stop by telling him she needed to go to the bathroom: "When nothing else was working, I

2

told him that I had to go to the bathroom about four times. And so the fifth time I hit him in the chest and yelled it really loud, and then he stopped." According to C.B., she went into the bathroom and locked the door and "tried to think of the best way to get out of there." When C.B. came out of the bathroom, she put her clothes on and told Harris that she had to leave. Harris became angry with her, picked her up and moved her to the living room. He then picked up C.B.'s shoes, picked her up again, put her outside the apartment, and threw her shoes at her.

Harris contradicted C.B.'s version of events. According to Harris, the entire encounter was consensual. Harris testified that C.B. never asked him to stop, complained that he was being too rough, or otherwise indicated that she did not wish to continue having sex with him. Harris acknowledged that his condom broke while they were having sexual intercourse. He stated that, when C.B. brought this to his attention, he took off the broken condom and put on a new one, and they continued to have intercourse. At some point, C.B. told Harris that she had to go to the bathroom, and then repeated it again within a few seconds. Harris then rolled over, and C.B. got up and went to the bathroom. According to Harris, there was no indication that C.B. was upset until she returned from the bathroom. Harris stated that C.B. began gathering her clothes and getting dressed, and he asked her what was wrong, but "[s]he said absolutely nothing. She just acted very shy." Harris became frustrated with C.B. because she wouldn't respond to his questions: "And I was like, you know, well, if you are going to act weird and, you know, you are making me feel uncomfortable, you can just get your shit and go, basically. Like I said, she still didn't respond." Harris then picked C.B. up by the waist and carried her into the living room. He asked her again why she was acting upset and when she did not respond, "I picked her up again and I opened the door and I basically sat her outside the door. And I said, you know, something derogatory like, you can just

3

get the fuck out, you bitch, or something like that. I closed the door and locked it, not thinking that she was leaving or anything." Harris stated that he regretted kicking her out, but that he did so because she was not responding to his questions and he "was just looking for any kind of response."

After C.B. left Harris's place, she called her ex-girlfriend, Megan McGuffee. McGuffee testified that when C.B. called she was crying and sounded "very distraught." At first, McGuffee had a hard time understanding C.B.:

> I would say we were on the phone for approximately ten minutes before she had calmed down enough and got enough of a deep breath to start—to actually speak. And then she said she had been raped and then she started crying again, and I had to get her calmed down again.

C.B. then went to where McGuffee was working. When C.B. arrived, "[s]he was very upset. She seemed really scared. She was shaking." McGuffee and her supervisor attempted to calm C.B. and then called the police.

Two officers from the Austin Police Department arrived at McGuffee's office and interviewed C.B. The officers testified that C.B. appeared upset and was crying. Officer Becky Briegel testified that C.B. was reluctant to talk to them at first, so Briegel "just kept talking to her, making small talk with her trying to get her to open up to me to tell me what had happened." After C.B. told them about the events of the evening, they took C.B. to St. David's hospital to be examined by a Sexual Assault Nurse Examiner ("SANE nurse"). According to the SANE nurse, C.B. had injuries that are indicative of non-consensual sex. The SANE nurse testified that sexual assault victims often have no visible injuries and that "when you do see injury, it is a significant finding."

4

That night and over the next couple of days, Harris sent several derogatory messages to C.B.—via text message, voicemail, and the website MySpace. In one message, Harris told C.B., "Wat [sic] a slut ... I'm calling you [sic] family tomorrow .. You are nasty .. I'm telling everyone if you don't call me." (Ellipses in original.) Harris testified that the messages were another effort to get C.B. to tell him why she was upset with him.

*The Plea Offers*

Harris was charged with sexually assaulting C.B. On March 18, 2007, the parties appeared before the trial court for the purpose of hearing several pre-trial motions. At that time, the trial court inquired into the status of the plea negotiations:

| | |
|---|---|
| The Court: | And has the State made an offer to you in the case? |
| Defense Counsel: | They have. |
| The Court: | What's the offer? |
| Defense Counsel: | It was five years in TDC. |
| The Court: | And you've talked to Mr. Harris about that; is that right? |
| Defense Counsel: | Yes, sir. |
| The Court: | Mr. Harris, do you understand what the offer is from the State in this case? |
| Harris: | Yes. |
| The Court: | Have you had an adequate chance to discuss that with your lawyer? |
| Harris: | Yes. |
| The Court: | Do you want to take that offer or not? |

5

| | |
|---|---|
| Harris: | Absolutely not. |
| The Court: | I'm sorry? |
| Harris: | Absolutely not. |
| The Court: | Did you-all have a counteroffer that you wanted to make? |
| Defense Counsel: | Judge, we kind of entertained some discussion. I believe his position on trying to get the State to reduce it to a misdemeanor for some time, he is not open to that at this point. |
| The Court: | And so you-all are not going to do that? |
| The State: | No, Judge. |

The court then ruled on the pre-trial motions, requiring the State to make its file available to defense counsel and to provide a witness list and notice regarding any extraneous-offense evidence it intended to introduce at least seven days before trial. On April 14, 2008, the State sent Harris a witness list and notice of its intent to introduce evidence of fourteen separate extraneous offenses and bad acts, including a prior sexual assault charge.

The case was set for trial on April 21, 2008. When the parties appeared on that day, the trial court again inquired about the plea negotiations:

| | |
|---|---|
| The Court: | And my understanding is that this is on the jury docket today because of the—y'all have not worked the case out; is that right? |
| Defense Counsel: | Yes, Judge. |
| The Court: | And your understanding was that the State had made an offer to y'all earlier of five years TDC? |
| Defense Counsel: | Yes, Judge. |

| | |
|---|---|
| The Court: | And that was to the charge of sexual assault? |
| Defense Counsel: | Yes. |
| The Court: | Okay. And sexual assault is not a 3g offense.[1] It's one he could get good conduct time, and he would be eligible at the end of a quarter of his sentence; is that right? |
| Defense Counsel: | Yes. |
| The Court: | And you have conferred with your client Mr. Harris about this offer; is that right? |
| Defense Counsel: | Yes, I have. |
| The Court: | Mr. Harris, do you understand what the offer is from the State in this case? |
| Harris: | Yes, sir. |
| The Court: | Okay. And do you want to accept that offer or not? |
| Harris: | No, sir. |
| The Court: | Okay. And you understand that they're not going to be offering that after this morning? |
| Harris: | Yes, sir. |

As the trial court further admonished Harris that this was his last chance to accept the proffered plea, the State interjected that the most recent offer was five years' probation, not five years' imprisonment. Defense counsel stated that she had not received that offer, and the

---

[1] Tex. Code Crim. Proc. Ann. art. 42.12 § 3g (West Supp. 2008); *see also* Tex. Gov't Code Ann. § 508.145(d) (West Supp. 2008) (person convicted of certain offenses listed in section 3g(a)(1) of article 42.12 is not eligible for parole until his actual calendar time served, without consideration for good conduct time, equals one half of the sentence or thirty calendar years, whichever is less). We note that sexual assault is in fact listed in section 3(g). *See* Tex Code Crim. Proc. Ann. art. 42.12 § 3g(a)(1)(H).

trial court recessed to allow Harris to confer with his trial counsel. When reconvened, the trial court checked with Harris regarding the new offer:

| | |
|---|---|
| The Court: | All right. In this cause, Mr. Harris, when we were recessed, my understanding is the State had made an offer to you in the case of five years to be probated over a five-year period, which was new information as far as all of us were concerned. I recessed at that point to give you a chance to discuss this with your lawyer. Have you been able to discuss this new plea bargain offer with your lawyer since then? |
| Harris: | Yes. |
| The Court: | Okay. And have you been able to talk to her to your satisfaction, or do you need some more time to talk to her about it? |
| Harris: | I believe I've talked to her enough. |
| The Court: | I'm sorry? |
| Harris: | I've talked to her enough. |
| The Court: | Okay. And you want to accept their offer or not? |
| Harris: | I won't register as a sex offender, sir. |

After confirming that Harris would have to register as a sex offender if he pleaded to the offense as alleged in the indictment, the trial court asked defense counsel if they had a counteroffer. Defense counsel stated, "Our counteroffer was that Mr. Harris was willing to plead to anything that would not require him to register as a sex offender." The trial court then asked the State if it was willing to offer either a misdemeanor offense or a felony that would not require sex offender registration. The State declined, and the trial court again checked with Harris:

8

| The Court: | Okay. And so you understand, Mr. Harris, that they are not willing to change their offer, that it would be five years probation to sexual assault? |
|---|---|
| Harris: | I'm ready to take it to trial. |
| The Court: | I'm sorry? |
| Harris: | I'm ready to take it to trial. |
| The Court: | Okay, you want to reject all their offers then? |
| Harris: | Yes. |

Harris then pleaded not guilty and the case proceeded to jury selection and trial.

*The Trial*

The key issue in dispute at trial was whether C.B. ever revoked her consent. C.B. testified, as did McGuffee, the two police officers who responded to McGuffee's call, the police investigator assigned to the case, and the SANE nurse who examined C.B.

The State then sought to call R.W., a woman who had made similar allegations against Harris in June of 2006, which resulted in Harris pleading guilty to simple assault, a Class A misdemeanor.[2] *See* Tex. Penal Code Ann. § 22.01 (West Supp. 2008). R.W. first testified outside the presence of the jury. She told the court that she met Harris at a party, where they were both drinking alcoholic beverages. She stated that the party lasted all night and, early the next morning, Harris asked her to give him and a friend a ride to Harris's apartment. When they arrived, Harris asked R.W. to come in and watch a movie. During the movie, Harris and R.W. began making

_____

[2] R.W. was included on the witness list that the State provided prior to trial, and the incident that is the subject of her testimony was included in the State's notice of intent to introduce extraneous-offense evidence.

out. R.W. told Harris that she wanted to have sexual intercourse with him, but that she was uncomfortable with some of his actions, because his friend was in the room. Harris then called a cab for his friend. While they were waiting for the cab to arrive, Harris continued to kiss R.W. and attempted to fondle her. Harris's persistence despite his friend's presence disturbed R.W., so she started to leave when the friend did, but was persuaded by Harris to remain and finish watching the movie. About thirty minutes after the friend left, Harris and R.W. began to make out again. R.W. testified that they disrobed and she asked Harris if he had a condom. When he said he did not, she told him she would not have intercourse with him without a condom. R.W. said that Harris then performed oral sex on her, with her consent, before penetrating her without her consent.

The State argued that, because the fact pattern that R.W. testified to was similar to the allegations in the case at bar, R.W. should be allowed to testify before the jury to rebut the defense of consent as raised through Harris's opening statements and his cross-examinations of C.B. and the other witnesses, citing to *Casey v. State*, 215 S.W.3d 870 (Tex. Crim. App. 2007) (holding that evidence of similar sexual assault was admissible to show intent in face of consent defense and to show *modus operandi*). *See also* Tex. R. Evid. 404(b) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of . . . intent"). Harris objected, arguing that (1) the defense had not raised the issue of consent, rather it had simply held the State to its burden of proving every element of the offense; (2) R.W.'s and C.B.'s fact patterns were not similar enough to come in under *Casey* even if the defense had raised the issue of consent; and (3) even if R.W.'s testimony was admissible under *Casey* it should be excluded as more prejudicial than probative. *See* Tex. R. Evid. 403 (relevant evidence should be excluded if its probative value

10

is substantially outweighed by the danger of unfair prejudice).  The trial court overruled these objections and admitted R.W.'s testimony.[3]  R.W. then repeated substantially the same testimony in the presence of the jury.

Harris testified on his own behalf.  He acknowledged having sexual intercourse with C.B., but testified that it was a consensual encounter.  Regarding the evening he spent with R.W., Harris testified that when she said she did not want to have sexual intercourse without a condom, he performed oral sex on her only, but never attempted to penetrate her.  Harris characterized C.B. and R.W. as the sexual aggressors, noting that "[b]oth women seemed to be a lot more sporadic, like I said, and charismatic outside of here than they [were] behind this microphone."

The jury found Harris guilty of sexual assault.  At the punishment phase, in addition to further testimony from C.B. and R.W., the jury heard from C.H., Harris's ex-girlfriend.  C.H. had dated Harris for approximately three months beginning in December 2005.  C.H. testified that Harris was both mentally and physically abusive to her during the relationship.  C.H. testified that one night near the end of their relationship, after they had both been drinking, they got into an argument and Harris grabbed her wrists and put his hand over her mouth.  When she woke up the next morning, she had bruises on her wrists and her mouth hurt from having bitten the inside of her cheek while struggling against him as he held her face.  C.H. also testified that, though she had made it clear to Harris that she was no longer interested in having an intimate relationship with him, when she woke up the next morning neither she nor Harris were clothed and she suspected that they had had intercourse the night before, though she was too intoxicated to remember it.  After C.H. broke up with Harris, she changed her phone number so that he could not contact her.  She testified,

---

[3] Harris does not appeal these rulings.

And then he came to my house one evening. I was the only one there. And he started banging on the front door and telling me to open it and saying things like, you can't do this to me, I love you. And then, of course, when I wouldn't, he got more angry and he went to the back door and he started banging on the back door, and I had already locked that one as well.

And it's an old, rickety house with glass doors. I thought—I mean, I literally thought he could have busted in the door if he really wanted to. So I called [my roommate] and told her what was going on and told her I didn't know what to do. And she was actually walking home from school at that point almost at the house, and she told me she was going to call the police.

C.H.'s roommate testified that when she got home, Harris was still banging on the door and on C.H.'s bedroom window, but that he left before the police arrived. The State also introduced evidence that Harris had been arrested for driving while intoxicated in 2006 and for evading arrest in 2005 and 2007. The officer who arrested Harris for the DWI offense testified that after he placed Harris under arrest, "[h]e began to taunt me and use a lot of profanity towards me, wanting to fight me." Harris received deferred adjudication for the 2005 incident and charges were still pending for the 2006 and 2007 incidents.

After the State submitted its punishment phase testimony, the court presented its proposed jury charge to the parties. The following exchange then took place:

| The State: | Judge, I have no objections. I just want to make a clarification in paragraph II at the very end with regard to parole eligibility. It talks about one half of the time served. I want to make sure that's correct. |
| --- | --- |
| The Court: | My understanding is that— |
| The State: | I think it is. |
| The Court: | You know, when I looked it up it says—it's in 3g(a)(1) and it's (H), which is a limit on judicially granted probation and |

| | makes him ineligible to get probation from me, but he could still get it from the jury.[4] |
| --- | --- |
| | And then when you look at 37.07, you know, it talks about it's 3g(a)(1) and then it says, except for these, and (H) is not one of the exceptions.[5] So far as I know, it would be a situation where he would not be able to get good conduct time and he would have to do one half of the sentence imposed. |
| The State: | That was my understanding, too. I just wanted to make sure. |
| The Court: | Is that your understanding as well? |
| Defense Counsel: | Yes. |

After confirming Harris's parole eligibility, the State and the defense both agreed to the charge.

The jury assessed punishment at seven years' imprisonment. Under the provisions of article 42.12 and section 508.154 of the government code, Harris is not eligible for parole until he has served three and a half years. *See* Tex. Gov't Code Ann. § 508.145(d) (West Supp. 2008) (prisoner convicted of certain offenses listed in section 3g(a)(1) of article 42.12, code of criminal procedure, is not eligible for parole until his actual calendar time served, without consideration for good conduct time, equals one half of the sentence or thirty calendar years, whichever is less).

On appeal, Harris claims that, had he not been initially misinformed that he would be eligible for parole after serving just one-quarter of his sentence, he would have taken the proffered plea bargain rather than risking trial. Therefore, he argues that the incorrect admonishment by the trial court, and the allegedly ineffective assistance of his trial counsel for not correcting the

---

[4] Tex. Code Crim. Proc. art. 42.12 § 3g(a)(1)(H).

[5] *Id.* at art. 37.07 § 4(c) (West Supp. 2008) (provisions regarding good conduct time are not applicable to person convicted of offense listed in section 3g(a)(1) of article 42.12).

trial court, renders his not-guilty plea involuntary. Harris also contends that he was told by his trial counsel that R.W. would not be allowed to testify at the guilt-innocence phase of the trial, and that this incorrect advice constitutes ineffective assistance of counsel and also renders his not-guilty plea involuntary.

## DISCUSSION

**Misstatement by Trial Court**

In his first point of error, Harris argues that his decision to go to trial on a plea of not guilty was involuntary because he was misinformed by the trial court regarding his parole eligibility. However, the statutory requirements that the trial court ensure that the plea is "free and voluntary" apply only to pleas of guilty or nolo contendere. *See* Tex. Code Crim. Proc. Ann. art. 26.13 (West Supp. 2008). This is so because there is a constitutional right to a fair trial, while there is no corresponding constitutional right to a plea bargain. *See Santobella v. New York*, 404 U.S. 257, 261 (1971). Therefore, even if a defendant "involuntarily" pleads not guilty, where the result is a fair trial, no constitutional right has been violated. *Cf. State ex rel Turner v. McDonald*, 676 S.W.2d 371, 373-74 (Tex. Crim. App. 1984) (requirement that State agree to trial by judge instead of trial by jury does not violate defendant's rights because "the result is simply that the defendant is subject to an impartial trial by jury—the very thing that the Constitution guarantees him" (quoting *Singer v. United States*, 380 U.S. 24, 36 (1965))).

Even if Harris could challenge the voluntariness of a not-guilty plea in the same manner as he could challenge the voluntariness of a guilty plea, his complaint would fail because he

has not proven that he was induced to plead not guilty by the trial court's misstatement.[6] *See Brown v. State*, 943 S.W.2d 35, 42 (Tex. Crim. App. 1997) (appellant must show plea was actually induced by incorrect admonishment); *Ex parte Smith*, 678 S.W.2d 78, 79 (Tex. Crim. App. 1984) (same). There is nothing in the record to support Harris's contention that he would have foregone his right to trial and taken the proffered plea had he been aware that he would not be eligible for parole until he served half of his sentence without credit for good-conduct time. The State's proffer of five years probation came after the trial court's misstatement. The only reason Harris gave on the record for rejecting the final offer was that he did not want to register as a sex offender. While Harris asserts in his brief to this Court that parole eligibility was a significant factor in his decision, assertions of fact in an appellate brief that are not supported by the record do not constitute evidence that may be considered on appeal. *McDonald v. State*, 64 S.W.3d 86, 89 (Tex. App.—Austin 2001, no pet.).

We overrule Harris's first point of error.

**Misstatements by Trial Counsel**

In his second and third points of error, Harris claims that his decision to go to trial on a plea of not guilty was involuntary because he received erroneous advice from his trial counsel regarding his parole eligibility and the admissibility of R.W.'s testimony. The State argues that we should overrule these claims for the reason detailed above—because no constitutional right is violated when a defendant involuntarily pleads not guilty. However, if Harris can prove that he was harmed by erroneous advice from trial counsel, he is entitled to reversal whether we treat his claim as an involuntary-plea claim or as a traditional ineffective-assistance-of-counsel claim. Either way,

---

[6] We note that the trial court's misstatement occurred in a conversation with trial counsel and was not a formal admonishment directed at the defendant.

Harris must prove (1) his trial counsel's performance was deficient, and (2) he was prejudiced by this deficiency. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984) (ineffective assistance of counsel); *Ex parte Morrow*, 952 S.W.2d 530, 536 (Tex. Crim. App. 1997) (citing *Hill v. Lockhart*, 474 U.S. 52, 56 (1985)) (involuntary plea). Therefore, in the interest of justice, we will address Harris's second and third points of error as traditional ineffective-assistance-of-counsel claims.

*Parole Eligibility*

In his second point of error, Harris claims that he was prejudiced by ineffective assistance of counsel because his trial counsel shared the trial court's misapprehension regarding Harris's parole eligibility. Without addressing whether this misapprehension rendered trial counsel's performance deficient, we conclude that Harris's second point of error must fail because he cannot show that he was prejudiced by this misapprehension.

An attorney's deficient performance is prejudicial when, but for the attorney's unprofessional conduct, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Harris claims that he would have accepted the proffered plea bargain if counsel had corrected the trial court's misstatement regarding parole eligibility, and thus the sentencing outcome would have been different. However, as discussed above, there is nothing in the record to support this claim. *See McDonald*, 64 S.W.3d at 89 (assertions of fact in appellate brief do not constitute evidence on appeal).

Furthermore, we note that even if parole eligibility was an integral part of Harris's plea decision, he still could not show that he was prejudiced by his misapprehension because he actually received less guaranteed prison time than he knowingly risked by pleading not guilty. Sexual assault is a second-degree felony and carries a punishment range of two to twenty years. *See*

16

Tex. Penal Code Ann. § 22.011 (sexual assault is second-degree felony), § 12.33 (West 2003) (punishment range for second-degree felony). Under Harris's mistaken understanding of his parole eligibility, by going to trial he risked serving a maximum of five years[7]—one-quarter of the maximum twenty-year sentence—before being eligible for parole. Under the correct formulation, Harris must serve just three-and-a-half years—one-half of his seven-year sentence—before being eligible for parole. Therefore, Harris received a lighter sentence than he risked, both in terms of his sentenced time and his actual time served before becoming eligible for parole.

We overrule Harris's second point of error.

*Admissibility of Extraneous-Offense Evidence*

In his third point of error, Harris contends that he was prejudiced by ineffective assistance of counsel because his trial counsel told him that R.W.'s testimony would not be admissible at the guilt-innocence stage of trial unless Harris testified and directly challenged the issue of consent in his own testimony. Therefore, Harris claims he originally planned to not testify in order to keep R.W. from testifying.[8] Harris contends that had he realized that R.W. would be able

_____

[7] The five-year minimum may be a combination of actual time served plus credit for good behavior. *See* Tex. Code Crim. Proc. Ann. art. 37.07(c). Good-conduct time "is a privilege and not a right," *see* Tex. Gov't Code Ann. § 498.003 (West 2003), and it is impossible to determine how much credit Harris could have earned—therefore, it is too speculative to be used to prove harm in this case.

[8] At sentencing, Harris told the trial court that he objected to the imposition of the sentence assessed by the jury because "I wouldn't have fought that case if I had known that the second witness was going to be allowed to testify. And the only reason I testified at all is because that second witness was able to testify, and I felt like I needed to respond." We assume that Harris is referring to R.W.'s testimony at guilt-innocence, as there is no basis for excluding R.W.'s testimony at punishment. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (West Supp. 2008) (evidence admissible at punishment includes "any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally

17

to testify based on his defensive theory of consent as raised in his opening statement and in his cross-examination of the witnesses, he would have taken the proffered plea and received a lesser sentence.

An attorney's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). We indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005) (citing *Thompson*, 9 S.W.3d at 813). The record before us is silent about what trial counsel did or did not tell Harris regarding the admissibility of R.W.'s testimony.[9] While Harris asserts in his brief to this Court that he was told by trial counsel that R.W. would not be allowed to testify at guilt-innocence if Harris did not testify, assertions of fact in an appellate brief that are not supported by the record do not constitute evidence that may be considered on appeal. *McDonald*, 64 S.W.3d at 89. Furthermore, "counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Godspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citing *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003)).[10]

---

convicted of the crime or act").

[9] While Harris's statement at sentencing provides some evidence that Harris was under the impression that R.W. could not testify, it does not show what gave him that impression or what advice his trial counsel gave him regarding the admissibility of R.W.'s testimony.

[10] The court of criminal appeals has noted the difficulty defendants face in overcoming the presumption of competent counsel and proving prejudice on direct appeal and has therefore suggested that such claims are better pursued through a habeas-corpus proceeding. *See Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).

Because Harris has not proven that his trial counsel's performance fell below an objective standard of reasonableness, we overrule his third point of error.

**CONCLUSION**

Having overruled all points of error on appeal, we affirm the judgment of conviction.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed:   August 26, 2009

Do Not Publish