

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-09-046-CR

CURTIS DALE LEWIS                                                                    APPELLANT

V.

THE STATE OF TEXAS                                                                         STATE

------------

FROM THE 271ST DISTRICT COURT OF JACK COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant Curtis Dale Lewis was charged by indictment with evading arrest with a vehicle and, in the companion case, with tampering with evidence. The two cases were tried together. The jury could not agree on a verdict in the evidence tampering case; that case therefore resulted in a mistrial. But the jury convicted Appellant of evading arrest with a vehicle and assessed his

---

[1] *See* Tex. R. App. P. 47.4.

punishment at fifteen years' confinement. The trial court sentenced him accordingly. In two points, Appellant contends that the trial court erred by admitting extraneous offense evidence during the guilt phase and that the trial court violated the Sixth Amendment Confrontation Clause by admitting a declarant's testimonial statements to law enforcement. Because we hold that the trial court did not err, we affirm the trial court's judgment.

Background Facts

At around 9:00 a.m. on May 27, 2008, informant Debbie Redding called Sergeant Melissa Wigington of the Jack County Sheriff's Office narcotics unit "out of the blue" to report that Appellant and William McColpin were at her home and that they all were on their way to Fort Worth to buy pseudoephedrine to manufacture methamphetamine. Redding told Wigington that she would call as often as she could. She called twice when they were buying Sudafed. During two other calls, they were buying items such as starter fluid and airline hose. At one point, they bought syringes and needles. Later, Redding called to say that they took the pills to a place in Jacksboro to be crushed. Wigington notified other law enforcement agencies, and they began surveillance as soon as Redding, McColpin, and Appellant returned to the Joplin area. In her final call, Redding told Wigington that they were waiting "on the word" to go to Young County to cook the methamphetamine.

2

Surveillance showed that Redding's car left her house about 7:10 p.m. Redding's car passed Wigington's car on Highway 380 West. Wigington identified Appellant as the driver, Redding as the front seat passenger, and McColpin as the back seat passenger. After learning that the suspect vehicle was heading his way, Deputy Darrell Self watched for it, saw it fail to maintain its lane by crossing over to the shoulder, activated the overhead emergency lights of his patrol car, and initiated a traffic stop. Other units, including Wigington, also arrived at the scene.

When Self approached Redding's stopped car, Appellant drove off. The fleeing vehicle pulled over to the shoulder, and Wigington saw items thrown out the vehicle's back door as its brake lights came on. The items were a clear plastic bag containing a red and white powder and silver objects later determined to be lithium batteries. Self did not see the brake lights, but he saw the bag of powder thrown out and noticed that the vehicle slowed down every time something came out of the rear passenger door.

Sergeant Shane Cartwright, with the Texas DPS Narcotics Service, assisted with the surveillance and stop. He tried to box the suspect vehicle in initially when Self had stopped it. Cartwright testified that after he made eye contact with Appellant, Appellant sped off, and Cartwright followed. The suspect vehicle periodically slowed down and sped back up and then repeated

3

the process. Cartwright noticed the brake lights come on and go off and also noted that the back right passenger door of the car would repeatedly crack open and close, and he saw the lithium batteries and a small white object come out of the car and bounce down the side of the road off into the ditch.

According to Self, Redding's car traveled about a mile and a half from the scene of the original stop. Deputy Francis, traveling east on Highway 380, activated his overhead lights and attempted to stop Redding's car. Appellant drove into a ditch and around Francis's car. Appellant was still driving on the shoulder a majority of the time, with the back door cracking open and items coming out of the vehicle. Appellant finally stopped about one-quarter mile from where Francis had tried to stop him.

Wigington's dashboard camera and the camera of one of the other units videotaped the action from when Self initiated the stop until after Appellant and McColpin were arrested and an inventory search of the car was conducted. The police recovered a fanny pack and sacks containing rags, bandanas, plastic ware, pitchers, a Gatorade can with a rag and t-shirt inside it, liquid drain opener, iodized salt, four cans of starter fluid, eight feet of airline tubing, pliers, an unopened ten-pack, tic tacs, syringes, and needles. The police also recovered "a considerable amount" of the powder thrown from the car as well as the lithium batteries. The powder was later tested and determined to be

4

16.79 grams of a substance that contained pseudoephedrine, a chemical precursor to methamphetamine.

McColpin, Appellant's accomplice, testified that he went with Appellant and Redding to buy pills and that they bought them in Springtown, Azle, and Lake Worth. He testified that he and Redding entered the stores and made the drug purchases because Appellant did not have identification, but Appellant bought the starter fluid and tubing. McColpin testified that he thought that they had bought approximately 700 pseudoephedrine pills. On the way back to Jacksboro, McColpin popped the tablets out of their plastic housing and put them in a bag. Back in Jacksboro, he took a nap while Appellant and Redding went to buy the syringes and plastic pitchers. McColpin then went to a friend's house and used her blender to grind up the pills. When they later drove away from Redding's house together, he thought they were going to go manufacture the methamphetamine.

McColpin testified that when the police pulled them over, he, Redding, and Appellant were all "freaking." He hit the back of Appellant's seat to "rattle him out of it" and said, "[G]o, you idiot. We've got a lab in here . . . ." McColpin testified that he then opened the back door and threw out the pseudoephedrine; he thought that he poured it all out. McColpin stated that

Appellant told him to throw out the batteries and that he was not stopping until McColpin threw them all out; McColpin threw the batteries out.

Redding testified that Appellant had been at her house for three days and that he planned to cook some methamphetamine. She said they picked up McColpin, whom she had never met, in Jacksboro. Unlike McColpin, she testified that she, McColpin, and Appellant all went into the stores and bought pills. Redding stated that in all, they bought over 500 or 600 pills. She testified that they bought other items for cooking methamphetamine but that she could not remember everything. Contrary to McColpin's testimony, she testified that she was "pretty sure" that McColpin purchased the starter fluid and tubing, not Appellant. Redding also testified that she bought the needles and syringes. She confirmed that they bought plastic ware and plastic pitchers, and she identified the fanny pack and Gatorade can as Appellant's. Redding testified that Appellant and McColpin planned to meet someone in Graham who had anhydrous ammonia to manufacture the methamphetamine. She testified that she saw both men throw things out of the car after the police tried to stop them but later stated that she was unsure whether Appellant threw anything out.

Sergeant Ron Pettigrew with the Texas Department of Public Safety Narcotics Service testified about two processes used to make

methamphetamine—the anhydrous method and the red phosphorous method, both of which use pseudoephedrine. He testified that the anhydrous, or "Nazi" method, is the method used 98% of the time in this area, and he explained how to make methamphetamine using the anhydrous method. He testified that ingredients needed to make methamphetamine include crushed pills; a solvent, such as ether, starter fluid, or Coleman fuel; the lithium from a lithium battery; anhydrous ammonia; sulfuric acid, the most common form of which he stated was drain cleaner; salt; and either a light bulb or some rags and tape to dry the sludge into a powder. The State introduced State's Exhibit No. 44, a DVD illustrating the anhydrous method, through Pettigrew, who had provided the DVD to the State because he frequently used it in training law enforcement.

The prosecutor showed Pettigrew photographs of evidence found in the vehicle. He testified that 700 pills should make about one-and-a-half ounces of methamphetamine; that the starter fluid in this case would act as the solvent; that the tubing would be used in the sodium chloride generator; that the pitchers would be used for the ingredients and mixing thereof; that the Gatorade jug would probably be used to store the anhydrous ammonia because it was a type of ice cooler; that the pliers would be used in stripping the lithium from the batteries; and that the bandanas would probably be used as filtering

7

material.  Pettigrew testified that the only thing missing from the items taken from the scene in order to make methamphetamine was anhydrous ammonia.

Admission of Testimony of Pettigrew and DVD Proper

In his first point, Appellant complains about the admission of extraneous offense evidence during the guilt phase.  Specifically, he complains about the testimony of Pettigrew and the DVD recording showing the process of manufacturing methamphetamine.  Appellant timely objected to the testimony and the DVD under rules of evidence 401, 403, and 404, and the trial court overruled his objections.

The evading arrest indictment provides that Appellant, "on or about the 27th day of May, 2008, . . . did then and there, while using a vehicle, intentionally flee from [Darrell] Self, a person the defendant knew was a peace officer who was attempting lawfully to arrest or detain the defendant."

The indictment for the offense of tampering with evidence provides that on the same date, Appellant

> did then and there, knowing that an investigation was in progress, to-wit:  an attempt to stop the vehicle in which the defendant was an occupant for a traffic offense, intentionally or knowingly alter, destroy, or conceal a white powder, to-wit: pseudoephedrine, with intent to impair its availability as evidence in the investigation[.]

Paragraph II provides that Appellant

8

did then and there, knowing that an offense had been committed, to-wit: possession or transport of certain chemicals with intent to manufacture a controlled substance, intentionally or knowingly alter, destroy[,] or conceal a white powder, to-wit: pseudoephedrine, with intent to impair its availability as evidence in any subsequent investigation or official proceeding related to the offense[.]

Rule of evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[2]  The evading arrest count required the State to prove that the police were trying to lawfully stop Appellant.[3]  The second paragraph of the evidence tampering charge required the State to prove that Appellant knew that an offense—possession or transport of certain chemicals with intent to manufacture a controlled substance—had occurred when the white powder was thrown from Redding's vehicle.  In either instance, the evidence describing how methamphetamine is made is relevant:  it tends to show that the stop was lawful for the evading arrest indictment, and it tends to show that a knowing offense was being committed for the evidence tampering indictment.  We therefore hold that the trial court did not abuse its discretion by overruling Appellant's rule 401 objection.

---

[2]Tex. R. Evid. 401.

[3]*See* Tex. Penal Code Ann. § 38.04(a) (Vernon Supp. 2009).

9

Further, because the challenged evidence has relevance apart from character conformity, we also hold that the trial court did not abuse its discretion by overruling Appellant's rule 404 objection.[4]

Rule 403 provides that relevant evidence may nonetheless be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[5]

As we have already stated, Pettigrew's testimony and the DVD were relevant to the elements of both cases, particularly the evidence tampering charge. The testimony also corroborated accomplice testimony of McColpin and Redding regarding Appellant's intent. Finally, at twenty-six pages, Pettigrew's testimony did not unduly delay the trial. We note that Appellant raises no argument about the length of the DVD. Consequently, we conclude that the trial court did not abuse its discretion by conducting the balancing test,[6] overruling Appellant's rule 403 objection, and admitting the challenged evidence. We overrule Appellant's first point.

---

[4]See Tex. R. Evid. 404(b).

[5]Tex. R. Evid. 403.

[6]*See Casey v. State*, 215 S.W.3d 870, 880 (Tex. Crim. App. 2007).

No Violation of Confrontation Clause When Redding Testified at Trial

In his second point, Appellant contends that the trial court violated his Sixth Amendment right to confront witnesses against him by admitting into evidence the out-of-court statements Redding made to Wigington while the alleged crime was in progress. But as the State points out, there is no violation of the Confrontation Clause when the declarant appears for cross-examination at trial.[7] Redding testified and was subject to cross-examination at trial. Consequently, the Confrontation Clause was not implicated by the admission of her out-of-court statements through Wigington. We overrule Appellant's second point.

Conclusion

Having overruled both of Appellant's points, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 31, 2010

---

[7]*See Crawford v. Washington*, 541 U.S. 36, 59 n.9, 124 S. Ct. 1354, 1369 n.9 (2004).