Opinion issued March 17, 2011



In The

Court of
Appeals

For The

First District
of Texas

————————————

NOS. 01-09-00631-CR
01-09-00632-CR

———————————

Phillip Abel Hernandez, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 263rd District Court

Harris County, Texas



 

Trial Court Case No. 1066022
Trial Court Case No. 1066023





 

O P I N I O N

          A jury convicted appellant
Phillip Abel Hernandez of indecency with a child (trial court case no. 1066022;
appellate court case no. 01-09-00631-CR) and of aggravated sexual assault of a
child under 14 years old (trial court case no. 1066023; appellate court case
no. 01-09-00632-CR).  See Tex.
Penal Code Ann. §§ 21.11, 22.021 (West Supp. 2010).  The trial court assessed punishment at
15 years in prison on each conviction, to run concurrently.  On appeal, Hernandez brings one issue
relevant to both convictions.  Though he
made no objection at trial, he argues now on appeal that the trial court’s
response to a question posed by the jury during its deliberations was a comment
on the weight of the evidence and improperly lowered the State’s burden of
proof.  We conclude that the trial
court’s instruction was erroneous because it was a comment on the weight of the
evidence, but in light of the entire record, we conclude that Hernandez was not
deprived of a fair and impartial trial. 
Because we find no egregious harm, we affirm the trial court’s judgment.

I.       Factual
background

Hernandez was accused of sexually assaulting his
daughter, C.H., on two occasions before her fourteenth birthday.  C.H. testified that the first incident
occurred when she was in the fifth grade. 
C.H.’s family was temporarily living with her aunt because Hernandez was
unemployed.  At that time, C.H. and her
younger brother shared a bedroom with their parents.  Ordinarily, C.H.’s parents slept in the bed,
and C.H. and her brother slept on pallets on the floor beside the bed.  At trial, C.H. drew a diagram of the room,
showing the orientation of the door, window, furniture, and where she and her
brother slept.  C.H. testified that she woke
early one morning when she felt a man lying beside her.  C.H. said she could tell it was a man because
of his big hands.  She recalled the time
of day because she remembered the sun coming up from the window.  She testified that she was lying on her side,
and the man was lying beside her, his front touching her back.  C.H. testified that she knew it was her
father and not her younger brother by the size of the man’s hands and because
she later turned and saw him.  She said
that Hernandez put his hand under her shirt and began rubbing her breasts.  Then he put his hand inside her underwear and
rubbed the outside of her vagina.  She
testified that she was confused and scared, so she kept her eyes closed and
pretended to sleep, hoping that her mother, who was sleeping in the bed nearby,
would wake up.

C.H. alleged that the second incident occurred when
she was in the seventh grade.  Her
parents had been separated for several months, during which time the children
lived with their mother.  When the
parents reconciled, they moved into an apartment together.  C.H. testified that she was home alone with
Hernandez, while her brother was with a relative who lived nearby.  She said that her father had been assembling
bunk beds upstairs while she watched television downstairs in the living
room.  When her father came downstairs,
they began to wrestle playfully.  C.H.
recalled that she was wearing a black skirt and a pink and black top and that
she ended up sitting on top of his stomach.

While she was straddling his stomach, he commented on
how much she had grown during the preceding months when he had not seen
her.  He then put his hands under her
shirt and began rubbing her breasts. 
C.H. testified that he stopped when she told him to stop, but he then
started trying to put his hands up her skirt. She testified that when she ran
from him, he told her to go into the downstairs bathroom, and she
resisted.  She said, “I was scared.  I knew what he was going to do to me in
there.”  She either elbowed him or kicked
in the stomach, and “that’s when he let go of me and I ran upstairs to my
room.”  In her room, she changed into pajama
pants and watched television.  Soon
thereafter, Hernandez came to her room, grabbed her arms from behind, forced
her to her knees, pulled down her pants and underwear, and put his fingers in
her vagina.  She testified that she knew
his fingers were there because she “could feel the long nails,” and it
hurt.  She ran to the bathroom and
cried.  C.H. said Hernandez later
apologized and said that “he wouldn’t do it again unless I told him to . . .
touch me.”

A couple of weeks later, Hernandez threatened to spank
C.H. with a belt because she had been fighting with her brother.  C.H. ran from Hernandez and told her mother
that he had touched her.  C.H. testified
that she was afraid her mother would not believe her, but that she “didn’t
think he had the right to punish [her] . . . after what he did.”  Her mother never called the police or child
protective services.

Approximately one year later, C.H. and her younger
brother evacuated with their maternal grandparents when Houston was threatened
by Hurricane Rita.  C.H. stayed with
relatives at a cabin while her parents remained behind in Houston.  One night while evacuated from Houston,
C.H.’s adult half-brother noticed her sitting alone outside, crying.  He repeatedly asked her what was wrong.  Eventually, she told him that her father had
touched her, and she told him not to tell anyone because she was
embarrassed.  At trial, her brother
testified that C.H. cried, avoided eye contact, and appeared embarrassed when
she spoke to him.  He told his uncle
about the disclosure, and the uncle told his wife, C.H.’s Aunt Romana.

The next morning, C.H. came to Romana’s bedroom.  Romana, who had been designated as the outcry
witness, testified that she knew something was wrong based on C.H.’s demeanor
and asked if she was okay.  C.H. began
crying and shaking, and Romana reassured her that anything that happened was
not her fault.  Romana testified that
C.H. kept asking, “Why?” and “How could he hurt me like this?”  Romana said that C.H. told her Hernandez came
into her room, pulled down her pants, and put his fingers inside her
vagina.  Romana testified that C.H. said
that she then locked herself in the bathroom and that Hernandez later
apologized and promised never to do it again unless she “wanted him to.”  Romana asked if this was the first time
Hernandez had done anything like this, and C.H. then told her about the first
incident.  She told Romana that while
sleeping in the same bedroom at her aunt’s house, Hernandez lay down beside her
and fondled her breasts and vagina while she pretended to sleep.

C.H.’s relatives contacted her mother, who made Hernandez
leave the home.  The police were
contacted, and the charges that are the subject of this appeal were brought
against Hernandez.

II.      Procedural
background

During voir dire, the court explained to the venire
panel the State’s burden of proof and the defendant’s presumption of innocence.
The State questioned the venire panel about the likelihood that a perpetrator
would commit a crime in front of eyewitnesses and whether the jury could
convict on the testimony of a single witness.

State:                    Now,
the law says that if I prove my case beyond a reasonable doubt with only one
eyewitness, then what’s the verdict?

Venireperson:       Guilty.

State:                    Come
on?

Venire:                 Guilty.

State:                    Guilty.  Does the law tell me who that witness has to
be?

Venire:                 No.

The defense did not object to any of the State’s voir dire questions
about convicting on the testimony of a single witness, and Hernandez does not
challenge this line of questioning on appeal.

          In addition to the
testimony of C.H., her older half-brother, and her aunt, the State presented
testimony from Claudia Mullin, the forensic interviewer who interviewed C.H. at
the Harris County Children’s Assessment Center, and Dr. Reena Isaac, who
conducted a physical and ano-genital examination.

          Mullin initially testified
about her training and experience in conducting forensic interviews, noting
that she had conducted thousands of such interviews.  C.H. was 13 years old at the time of the
interview and “developmentally on target.” 
Mullen said that children who have been abused on more than one occasion
often have difficulty pinpointing the date or time frame when the abuse
occurred.  She said she would not be
surprised if the child were wrong by a year or two as to the date when the
abuse occurred.

Based on her training and experience, the judge
permitted Mullin to testify generally about reasons why a person would delay
making an outcry of abuse, such as being in a state of shock or wondering if
other people will believe the allegations. 
Mullin testified without objection that she found plausibility,
consistency, appropriate language, and sensory details in C.H.’s statements
during her interview.  For example, C.H.
was tearful during the outcry portion of her interview, and she provided many
sensory clues.

          Dr. Isaac testified that
she performed a complete physical examination of C.H. at the Children’s
Assessment Center.  This examination was
done nearly six months after Mullin’s interview.  C.H. provided the social history, telling Dr.
Isaac about both instances of sexual abuse that she alleged against her
father.  Dr. Isaac said that C.H. was
cooperative, anxious, and tearful during the interview part of the
examination.  She noted that C.H. had
thoughts of hurting herself but no plan to carry out a suicidal thought.  Dr. Isaac testified that she found nothing
abnormal in C.H.’s examination.  However,
she also testified that a normal examination does not necessarily rule out the
possibility of sexual abuse.

          Hernandez testified in his
own defense, denying having molested or sexually assaulted C.H., and
controverting certain details of her accounts. 
First, he disputed C.H.’s depiction of the bedroom the family shared
when she was in fifth grade.  According
to Hernandez’s description, he would have had to crawl over C.H.’s mother to
get out of the bed when she was sleeping. 
He also testified that C.H.’s mother was a light sleeper and she would
have woken up if he crawled over her.  He
said he never had lain down beside C.H. when they slept in that bedroom.  He also testified that he and all his
children habitually bite their nails.

Hernandez testified that after his separation from
C.H.’s mother, they reunited and moved into an apartment with their
children.  He noticed changes in C.H.’s
behavior and demeanor: she fought with her brother, she argued with her mother,
and she was generally disrespectful and argumentative.  One day, while Hernandez and C.H.’s mother
were napping, C.H. fought with her brother in the living room.  The mother confronted the children, and when
Hernandez came into the living room, he saw C.H. threatening to punch her
mother.  Hernandez said that he got his
belt, and he was going to spank her for trying to hit her mother.  C.H. ran upstairs and hid under the bathroom
sink.  Hernandez said that he “hit her
with the belt a couple of times to see if she would get out but she didn’t get
out, she just kept screaming and screaming.” 
C.H. ran downstairs, and when Hernandez followed, he saw C.H. and her
mother talking and crying.  The mother
yelled and asked if C.H.’s allegations were true.  Hernandez testified that he believed C.H.
fabricated the allegations against him because she was angry that he tried to
spank her.  On cross-examination, he
conceded that although he had spanked C.H. with a belt in the past, she did not
accuse him of sexual abuse after those spankings.  He acknowledged that C.H. had told the truth
about their living with her aunt when he was out of work, and that C.H. got
excellent marks for behavior during the time frame when he contends she behaved
badly at home. 

          Hernandez’s final witness
was his older daughter, Samantha.  She
testified that he was a loving father whom she saw every other weekend and some
holidays as a child.  She said that he
never behaved inappropriately toward her and that bites his nails and keeps
them very short.

After the close of evidence, the
trial court instructed the jury as to the relevant law.  The jury charges included instructions about
the presumption of innocence, the State’s burden of proof, and the jury’s role
as factfinder:

All persons are presumed to be innocent and no person
may be convicted of an offense unless each element of the offense is proved
beyond a reasonable doubt.  The fact that
he has been arrested, confined, or indicted for, or otherwise charged with the
offense gives rise to no inference of guilt at his trial.  The law does not require a defendant to prove
his innocence or produce any evidence at all. 
The presumption of innocence alone is sufficient to acquit the
defendant, unless the jurors are satisfied beyond a reasonable doubt of the
defendant’s guilt after careful and impartial consideration of all the evidence
in the case.

The prosecution has the burden of proving the
defendant guilty and it must do so by proving each and every element of the
offense charged beyond a reasonable doubt and if it fails to do so, you must
acquit the defendant.

. . . .

 

You are the exclusive judges of the facts proved, of
the credibility of the witnesses and the weight to be given their testimony,
but the law you shall receive in these written instructions, and you must be
governed thereby.

During their deliberations, the jurors sent a note to the
trial court stating:

Voir
Dire

 

We need the piece of law regarding
the “single witness” as it pertains to evidence.  Basically, what the law says.  



The trial court responded in writing:

A conviction is supportable
on the uncorroborated testimony of the victim of the sexual offense if
you believe the witness beyond a reasonable doubt.

 

There is no record of any discussion by the trial court and counsel of
the jury’s note.  The response returned
by the trial court does not indicate whether counsel approved of the response.  There is no record that Hernandez objected to
this instruction, and on appeal, he concedes that he did not.

          The jury returned guilty
verdicts on both counts, and the trial court assessed punishment.  Hernandez appealed, arguing that the trial
court’s response to the jury’s question commented on the weight of the
evidence, improperly lowered the State’s burden of proof, and deprived him of a
fair and impartial trial.

III.    Analysis

A trial court’s substantive answer to a jury question during
deliberations is considered an additional or supplemental instruction to the
jury that is governed by the requirements of article 36.14 of the Code of
Criminal Procedure.  Daniell v. State, 848 S.W.2d 145, 147 (Tex. Crim. App. 1993); see Guajardo v. State, 176 S.W.3d 402,
405 (Tex. App.—Houston [1st Dist.] 2004, pet. ref’d).  Article 36.14 requires that the trial court
deliver to the jury a “written charge distinctly setting forth the law
applicable to the case; not expressing any opinion as to the weight of the
evidence, not summing up the testimony, discussing the facts or using any
argument in his charge calculated to arouse the sympathy or excite the passions
of the jury.”  Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007).  “A charge that assumes the truth of a
controverted issue is a comment on the weight of the evidence and is
erroneous.”  Whaley v. State, 717 S.W.2d 26, 32 (Tex. Crim. App. 1986); see also Grady v. State, 634 S.W.2d 316,
317 (Tex. Crim. App. 1982) (observing that “trial court in its charge to a jury
should never give the jury an instruction which constitutes a comment by the
court on the elements of the alleged offense, or assumes a disputed fact”).

a.    
Standard of review

We employ a two-step process to review allegations of
jury-charge error.  First, we determine
whether error exists in the charge.  Ngo v. State, 175 S.W.3d 738, 744 (Tex.
Crim. App. 2005).  Our review should not
be limited to just one part of the charge standing alone.  Selvage
v. State, 680 S.W.2d 17, 20 (Tex. Crim. App. 1984); Ybarra v. State, 890 S.W.2d 98, 106 (Tex. App.—San Antonio 1994,
pet. ref’d).  The meaning of a jury
charge “should be taken from the whole charge, not just from a certain few
instructions read in isolation.”  Plata v. State, 926 S.W.2d 300, 302
(Tex. Crim. App. 1996), overruled on
other grounds by Malik v. State, 953 S.W.2d 234 (Tex. Crim. App. 1997).

If there is error, we then proceed to review the record to
determine whether sufficient harm was caused by the error to require reversal
of conviction.  Id.  When an appellant claims
that a jury-charge error violated a constitutional right, but he has failed to
preserve the error, article 36.19 of the Texas Code of Criminal Procedure sets
out the applicable standard of review.  Hutch v. State, 922 S.W.2d 166, 170 (Tex.
Crim. App. 1996).  That article provides in
part that “the judgment shall not be reversed unless the error appearing from
the record was calculated to injure the rights of defendant, or unless it
appears from the record that the defendant has not had a fair and impartial
trial.”  Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006).  Thus, when the defendant fails to object or
states he has no objection to the charge, the court will not reverse for charge
error unless the record shows egregious harm to the defendant.  Ngo,
175 S.W.3d at 743–44.

b.   
Review of jury charge

In its reply to the jury’s note asking for “the piece
of law regarding the ‘single witness’ as it pertains to evidence,” the trial
court stated: “A conviction is supportable on the uncorroborated testimony of
the victim of the sexual offense if you believe the witness beyond a reasonable
doubt.”  The State relies upon Casey v. State, 215 S.W.3d 870 (Tex.
Crim. App. 2007), and argues that the instruction was proper despite the
reference to a “victim” because it tracked article 38.07 of the Code of
Criminal Procedure* and therefore was a
correct statement of law.  We conclude
that Casey is distinguishable from
this case for two reasons—the statute tracked by the court’s instruction was not
relevant law in this trial, and the “victim” reference assumed the truth of the
key contested issue.

As a general proposition, a jury charge that tracks
the language of the relevant statute is sufficient and therefore not erroneous.
 See
Casey, 215 S.W.3d at 886–87; Martinez
v. State, 924 S.W.2d 693, 699 (Tex. Crim. App. 1996); Riddle v. State, 888 S.W.2d 1, 8 (Tex. Crim. App. 1994) (“A jury
charge which tracks the language of a particular statute is a proper charge on
the statutory issue.”).  But article
38.07, titled “Testimony in Corroboration of Victim of Sexual Offense,” was not
a relevant statute for purposes of instructing the jury because it was
inapplicable to this case.  The provision
“allows a conviction for a sexual offense to rest on the uncorroborated
testimony of the victim only if there is evidence that she made an outcry to
some person other than the defendant within six months of the offense.”  Scoggan
v. State, 799 S.W.2d 679, 680–81 (Tex. Crim. App. 1990).  Historically, the “corroboration or outcry”
requirements of article 38.07 did not apply to child victims of sexual
assaults who could never be accomplice witnesses to the crime because of their
inability to give legally operative consent to sexual intercourse.  See id.
(citing Hernandez v. State, 651
S.W.2d 746 , 751–53 (Tex. Crim. App. 1983) (opinion on rehearing adopting
original concurring opinion as majority opinion)).  Moreover, the plain language of the statute
exempts from its requirements a complainant who, as in this case, is 17 years
old or younger at the time of the offense. 
See Tex. Code Crim. Proc.
Ann. art. 38.07(b)(1) (West
2005).  Thus, although the trial court’s
instruction to the jury was a correct statement of the law insofar as it
correctly mirrored a provision of the Code of Criminal Procedure, it
nevertheless did not apply to this case and therefore was not the relevant law
for purposes of charging the jury in this case.

In addition to approving the use of language directly
tracking the relevant statute, the Court of Criminal Appeals in Casey also noted that it was “not
persuaded that the charge as written ‘assume[d] the truth of a controverted
issue,’ or that the appearance of the word ‘victim’ in the charge without the
modifier ‘alleged’ is a comment by the trial court which assumes the truth of a
controverted issue—the issue of consent.” 
Casey, 215 S.W.3d at 887.  As noted previously by this Court in another
case involving a jury instruction based upon article 38.07:

It appears that the Court of Criminal Appeals drew a
distinction between the Penal Code provision at issue in Casey and the Code of Criminal Procedure provision at issue here.  In Casey,
the Penal Code provision from which the jury charge language was taken
describes an aggravating factor that elevates a crime from sexual assault to
aggravated sexual assault if the defendant administered a date-rape drug “to
the victim of the offense with the intent of facilitating the commission of the
offense.”  Tex. Penal Code Ann. § 22.021(2)(A)(vi) (West Supp. 2008).
 The date-rape drug language forms the
second of two prongs of the statute, the first being that a sexual assault
occurred.  The “victim” language in Casey did not assume the truth of a
contested issue because, in order to reach the “victim” language, the jury in Casey had to have found that the
complainant was indeed a victim of sexual assault.

Bratcher v. State, No. 01-08-00610-CR, 2009 WL 1331344,
at *11 (Tex. App.—Houston [1st Dist.] May 14, 2009, pet. ref’d) (not designated
for publication).  In contrast to Casey, the reference to “victim” in this
case did embrace a contested issue—whether C.H. was a “victim” of
actions allegedly committed by Hernandez, and thus whether those alleged
actions constituted a “sexual offense.”

The language used by the trial court to respond to the
jury’s question, at least when considered in isolation, assumed the premises
that the complainant was a victim and that a sexual offense was committed.  Accordingly, to the extent this aspect of the
jury instructions assumed the truth of a controverted issue, it was a erroneous
comment on the weight of the evidence.  See id.; see also Talkington v. State, 682 S.W.2d 674, 674–75 (Tex. App.—Eastland
1984, pet. ref’d) (jury charge reference to “victim” in rape case was improper
comment on weight of evidence because there was no dispute that sexual
intercourse had occurred and sole issue whether it was consensual and the
complaint was truly a “victim”); accord Veteto
v. State, 8 S.W.3d 805 (Tex. App.—Waco 2000, pet. ref’d); Hernandez v. State, No. 03-03-00758-CR,
2004 WL 2110396, at *5–6 (Tex. App.—Austin Sept. 23, 2004, no pet.) (not
designated for publication).

We conclude that the trial court erred by commenting on the
weight of the evidence.  See Whaley, 717 S.W.2d at 32.  Because we hold that the trial court erred by
commenting on the weight of the evidence, we need not address whether the same
statements were also erroneous because they were nonresponsive.  We now turn to our harm analysis and
consider, among other things, Hernandez’s argument that the trial court’s error
improperly lowered the State’s burden of proof.

c.     
     Harm
analysis

Having found error, because there was no objection at
trial we must analyze the error for egregious harm, which exists when a court
determines that “the case for conviction or punishment was actually made
clearly and significantly more persuasive by the error.”  Saunders
v. State, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991).  The purpose behind this analysis is to show
whether any jury charge error has actually—not merely theoretically—harmed the
accused.  Almanza v. State, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984).  The actual degree of harm must be evaluated
in light of: (1) the entire jury charge; (2) the state of the evidence,
including the contested issues and the weight of the probative evidence; (3)
the final arguments of the parties; and (4) any other relevant information
revealed by the trial record as a whole. 
Allen v. State, 253 S.W.3d
260, 264 (Tex. Crim. App. 2008).  A
jury-charge error harms a defendant egregiously if it affects the “very basis”
of a case and “deprives the defendant of a valuable right, or vitally affects a
defensive theory.”  Id. 

          1.       Jury
charge.  Before the jury began its deliberations, the
trial court instructed the jury on each of the two charged offenses.  In its jury charges, the trial court
instructed the jury on the presumption of innocence and the necessity to acquit
the defendant unless the prosecution has proved “each and every element of the
offense charged beyond a reasonable doubt.” 
The charges included application paragraphs properly applying the law to
the facts of the case.  These charges did
not use the word “victim.”  The
application paragraphs referred to C.H. by her name, and although it was clear
from context that C.H. was the alleged “victim” of sexual assault, the
instruction the trial court gave the jury in response to its note was given in
the abstract and did not apply the law in relation to this case.  The trial court’s response to the jury’s
question must be reviewed in the context of the entirety of the court’s
charge.  See Plata, 926 S.W.2d at 302.  Viewed in this context, although the
supplemental instruction improperly referred to the complainant as “victim,” it
did not override or contradict the other parts of the charge that correctly
instructed the jury as to the presumption of evidence and the burden to prove
all elements of the charged offenses beyond a reasonable doubt.

          2.       State of the evidence. 
This was not a two-witness case—the jury was not put to the task of
choosing to believe only C.H. or only Hernandez.  The State brought forth other witnesses and
circumstantial evidence that corroborated C.H.’s testimony.  The State introduced C.H.’s detailed
testimony and the video recording of her interview at the Children’s Assessment
Center.  In addition, the State presented
C.H.’s brother, who testified that he found her crying and alone and that she
told him her father had inappropriately touched her.  The State also presented C.H.’s aunt Romana,
who testified about what C.H. told her as an outcry witness.  Finally, the State introduced Mullin, the
forensic interviewer, and Dr. Isaac, the examining doctor.  Each witness testified that C.H. had repeated
her allegations and each witness described the allegations to the jury, who was
able to determine how consistent C.H.’s story remained.  In addition, C.H.’s brother, aunt, Mullin,
and Dr. Isaac all testified about how tearful and upset C.H. was when
describing the alleged sexual assaults.  Dr.
Isaac testified that C.H. wanted to harm herself.

          Hernandez provided controverting
evidence about the location of furniture in the family’s shared bedroom and the
length of his fingernails.  He denied the
allegations.  However, he conceded that
C.H. was telling the truth about some of her testimony and his story about
getting his belt to spank her for fighting with her brother was consistent with
C.H.’s account of what happened the day she first told her mother that her
father had assaulted her.  Moreover,
Hernandez’s testimony that C.H. had exhibited behavior problems at home was
juxtaposed with evidence that she received excellent marks for her behavior at
school during the same time frame.

          Hernandez argues that the
trial court’s response to the jury’s question invited the jury to disregard all
discrepancies in C.H.’s story as told to the various witnesses.  Romana’s testimony arguably conflicted with
C.H.’s, and Hernandez contends that the trial court’s instruction precluded the
jury from finding reasonable doubt based on this conflict.  In particular, Hernandez argues that C.H.
testified that he assaulted her while she was on her knees, but Romana
testified that C.H. told her that Hernandez was sitting on the edge of her bed
when he assaulted her.  While such an alleged
inconsistency was relevant to the jury’s determination of C.H.’s credibility, the
jury was not required to resolve such details in order to convict Hernandez.  Ultimately, the trial court’s instruction did
not invite the jury to disregard inconsistencies that went C.H.’s credibility.  To the contrary, in order to convict the
instructions expressly required the jury to believe C.H.’s testimony on the
elements of the charged offenses beyond a reasonable doubt.

          3.       Arguments of counsel.  During
its closing arguments, the State referred to the voir dire questions about the
one-witness rule.  The prosecutor
reminded the jury, “[E]ach and every one of you promised me that if you
believed the child, the evidence would demand a guilty verdict.”  The State, however, did not focus its closing
on this argument.  Rather, the State’s
closing arguments summarized the evidence and urged the jury to conclude that
C.H. was credible and to return a guilty verdict.  Importantly, the State’s closing arguments
preceded the error identified by Hernandez’s appeal, which occurred after the
presentation of all evidence and the final arguments of counsel.  There was no opportunity for the State to
present any argument capitalizing on or exacerbating the effect of the trial
court’s error.  Accordingly, the
arguments of counsel did not cause the erroneous instruction to become
egregious.

          4.       Other relevant information. 
Finally, we note that the State discussed the so-called one-witness rule
with the venire panel during voir dire and reminded the jury about it during
closing arguments.  Hernandez did not
object in either instance.

*        *        *

Based on the entire record, we conclude that the trial
court’s error did not deprive Hernandez of a fair and impartial trial.  Because we consider the jury charge as a
whole, we conclude that the additional instruction, which required the jury to
believe C.H. beyond a reasonable doubt, did not lower the State’s burden of
proof, when read in conjunction with the application paragraph that required
the jury to find every element of the offense proven beyond a reasonable
doubt.  The verdict was supported by C.H.’s
direct testimony, circumstantial evidence supporting C.H.’s credibility—including
her demeanor, thoughts of harming herself after the assaults, sensory details
provided in her story—and the consistency of her story.  The error was not exacerbated by arguments of
counsel, because it occurred after closing arguments.  Hernandez did not object to other instances
in which the State talked about the so-called one-witness rule.  Having considered all of these factors, we
cannot say that the trial court’s error actually made the case clearly and
significantly more persuasive.  See Saunders, 817 S.W.2d at 692.  We overrule Hernandez’s issue.

Conclusion

          We
affirm the judgments of the trial court. 

 

                                                Michael
Massengale

                                                Justice

 

Panel consists of Justices Keyes, Sharp, and
Massengale.

Justice Sharp, dissenting.

Publish.  Tex.
R. App. P. 47.2(b).

 

 











*           Article
38.07 of the Code of Criminal Procedure provides:

 

Testimony in Corroboration of Victim of Sexual Offense

(a) A conviction under Chapter 21 [sexual offenses],
Section 22.011 [sexual assault], or Section 22.021 [aggravated sexual assault],
Penal Code, is supportable on the uncorroborated testimony of the victim of the
sexual offense if the victim informed any person other than the defendant, of
the alleged offense within six months after the date on which the offense is
alleged to have occurred.

(b) The requirement that the victim inform another
person of an alleged offense does not apply if at the time of the alleged
offense the victim was a person:

(1) 17 years of age or younger;

(2) 65 years of age or older; or

(3) 18 years of age or older who by reason of age or
physical or mental disease, defect, or injury was substantially unable to
satisfy the person’s need for food, shelter, medical care, or protection from
harm.

Tex. Code
Crim. Proc. Ann. art.
38.07 (West 2005).