In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00438-CR
_____

MONTIE EUGENE GRAHAM JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 359th District Court
Montgomery County, Texas
Trial Cause No. 16-12-14988-CR

**MEMORANDUM OPINION**

Montie Eugene Graham Jr. appeals from his conviction for aggravated robbery. In a single issue, Graham argues the trial court erred by allowing the detective in charge of the investigation of the robbery to testify that Graham, in the detective's opinion, was guilty of robbing the bank. We hold that while admitting the detective's opinion was error, the error was harmless.

1

## Background

In March 2017, a grand jury indicted Graham for aggravated robbery, alleging he robbed a bank in Montgomery County, Texas, while using a deadly weapon, a firearm.[1] During Graham's trial, the prosecutor asked the detective in charge of investigating the bank robbery the following questions:

> [Prosecutor]: Detective, by the end of your investigation, after considering all the evidence, including the surveillance videos, the photos, and the cellular device, and all that, did you make a determination about who you believe robbed the BBVA bank on December 20, 2016?
>
> [Defense]: I object to that. That's the jury's question to answer not his.
>
> [The Court]: Okay. It's overruled.
>
> [Prosecutor]: So, did you —
>
> [The Court]: You may answer.
>
> [Prosecutor]: Yes, Your Honor. Thank you. Did you come to formulate an opinion about who you believed robbed the bank?
>
> [Detective in Charge]: Yes, sir. I believe it was Montie Eugene Graham, Jr., robbed the bank.

Based on the testimony and evidence admitted before the jury in the trial, the jury found Graham guilty of aggravated robbery. Graham tried the punishment-

---

[1] *See* Tex. Penal Code Ann. § 29.03(a)(2) (West 2019).

phase of the case to the court. In the punishment-phase of the trial, Graham pleaded true to the three enhancement paragraphs in the indictment, which allege that Graham had been convicted previously of three other felonies. When the punishment phase ended, the trial court assessed Graham's punishment at life.

## Standard of Review

We employ an abuse of discretion standard to review a trial court's ruling admitting or excluding evidence in a trial.[2] Rule 701 of the Texas Rules of Evidence contains the principles governing the admission of testimony by lay witnesses.[3] One of those principals requires that opinions of lay witnesses be based on the witness's perception.[4] And that requirement is consistent with another rule of evidence, Rule 602, which requires lay witnesses to have personal knowledge on the matters on which their opinions are based.[5] For that reason, we review Graham's arguments through the lens of Rule 701.[6]

---

[2] *See Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

[3] Tex. R. Evid. 701 (Opinion Testimony By Lay Witnesses).

[4] *Id*. 701(a).

[5] *Id*. 602.

[6] *Id*. 701.

Analysis

In its brief, the State acknowledges that, when the detective in charge of the investigation testified, he never held himself out as an expert on questions arising over a defendant's guilt. For that reason, the trial court could admit the detective's opinion as a lay opinion only if the detective's opinion was based on his personal knowledge and found the opinion helpful to the jury's ability to clearly understand the detective's testimony or to the jury's duty to determine a fact at issue in the trial.[7]

But the record before us fails to show the detective's opinion was based on any personal knowledge. Instead, he clearly based his opinion on the conclusions he drew from investigating the bank robbery. As such, the detective's opinion was not based on his personal knowledge, as he did not see the robbery occur. And the detective's opinion was not helpful since the jury could easily understand what the detective explained he did to investigate the robbery. Finally, the detective's opinion was not helpful to determining a fact at issue. It was based neither on the detective's consideration of the evidence admitted at trial, nor guided by the instructions and definitions the trial court gave the jury in the charge.[8]

---

[7] *Id*. 701; *Ex parte Nailor*, 149 S.W.3d 125, 134 (Tex. Crim. App. 2004).

[8] *See* Tex. R. Evid. 701; *Boyde v. State*, 513 S.W.2d 588, 590 (Tex. Crim. App. 1974); *DeLeon v. State*, 322 S.W.3d 375, 383 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd).

We conclude the trial court erred by failing to sustain Graham's objection to the prosecutor's question and should not have allowed the jury to hear the detective express an opinion on Graham's guilt.[9]

Nonetheless, we must also decide whether the error was harmful. Defendants appealing convictions claiming evidentiary errors occurred must show the error affected the defendant's *substantial rights* before they are entitled to another trial.[10] And errors in admitting evidence generally will not affect a defendant's *substantial rights* if the reviewing court, after examining the record as a whole, has "fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict."[11]

Factors the reviewing court considers in reviewing non-constitutional errors include "the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case," whether the State emphasized the error, and whether the record contains

---

[9] *See Fairow v. State*, 943 S.W.2d 895, 899 (Tex. Crim. App. 1997) (explaining that if a witness's testimony yields testimony that amounts to "choosing up sides" or an opinion of guilt or innocence, the witness's opinion should be excluded) (citing *Boyde*, 513 S.W.2d at 590).

[10] *See* Tex. R. App. P. 44.2(b); *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007).

[11] *Casey*, 215 S.W.3d at 885.

5

overwhelming evidence showing the defendant committed the crime.[12] We use these factors when examining the record in this case as a whole.

Of the seven witnesses who testified in the guilt-innocence phase of Graham's trial, two worked for the bank. The bank employees explained they did not see the face of the man who robbed the bank because he covered his face. The bank employees noticed several things about the robber as he was holding them up while they were working that day. They noticed the robber wore either a black jacket or hoodie, and that he had on gloves. One of the bank employees testified that the robber had an average build and was around six feet tall. Both employees remembered the robber pointed a handgun at the teller he approached.

While neither employee saw the man's face, a great deal of evidence in the record ties Graham to the robbery. That evidence includes the following:

- ✓ The afternoon of the robbery, one of Graham's neighbors captured video showing a single-cab-dark-blue-Dodge truck leaving the neighborhood where Graham lived;

- ✓ Shortly thereafter, video footage, which police obtained from a truck stop near Graham's house, shows a man with tattoos matching Graham's, wearing blue jeans, a white t-shirt, and white-soled shoes getting drinks and leaving;

- ✓ Less than an hour later, video footage from a camera at a gas station near the bank shows a single-cab-dark-blue-Dodge truck cutting across the station's lot;

---

[12] *Motilla v. State*, 78 S.W.3d 352, 355-56 (Tex. Crim. App. 2002) (cleaned up).

- Still photos taken from the gas station's surveillance footage shows the Dodge truck had two tires in its bed, damage to the rear bumper, and a sticker on the tailgate. Police located Graham's truck during their investigation. Graham owns a single-cab-dark-blue-Dodge truck. The damage to the back of Graham's truck as well as the sticker matched the characteristics of Graham's truck;

- Minutes later, video footage police obtained in their investigation from a car wash near the bank shows a single-cab-dark-blue-Dodge truck entering an apartment complex located behind the bank;

- Video footage the police obtained from the apartment complex shows a single-cab-dark-blue-Dodge truck backing into a parking spot in the apartment complex's lot;

- About half-an-hour later, video footage from the apartment complex and car wash shows the single-cab-dark-blue-Dodge truck leaving the apartment complex's lot;

- Shortly before the robbery, video footage from the apartment complex and the car wash shows a single-cab-dark-blue-Dodge truck return to the apartment complex;

- Video footage from the apartment complex and car wash shows a single-cab-dark-blue-Dodge truck slow and then back into the same parking spot where the same truck parked earlier that day. The footage shows damage on the rear bumper and a sticker on the tailgate of the truck;

- Video footage police obtained from a restaurant adjacent to the bank shows a man appearing from a hole in the fence running behind the bank;

- The footage from the restaurant shows the man who went through the hole in the fence walking toward the bank. The man in the video is wearing dark clothing and white-soled shoes;

✓ Within minutes of the robbery, video footage from the restaurant adjacent to the bank shows the man in white-soled shoes running back to the hole in the fence;

✓ Video footage from the car wash shows the single-cab-dark-blue-Dodge truck leaving the apartment complex;

✓ Shortly thereafter, cellphone data obtained by police and the testimony of Graham's landlord established that Graham used the cellphone he regularly used, which belonged to his girlfriend, to call his landlord;

✓ About twenty minutes later, video footage that police obtained from Graham's neighbor shows a single-cab-dark-blue-Dodge truck traveling towards Graham's home;

✓ Cellphone data for the phone Graham used established the phone was in areas of town on the day of the robbery consistent with the locations where the police obtained video footage that depicts the blue Dodge truck;

✓ Cellphone data extracted from the phone also shows the phone was used to search the internet for information about robberies in Conroe, breaking news in the area, and two-dollar bills after the robbery;[13]

✓ According to Graham's landlord, the evening on the day the robbery occurred Graham paid his rent in his usual manner, using cash.

While circumstantial, the video footage admitted into evidence in Graham's trial traces a single-cab-dark-blue-Dodge truck with damage and a sticker on it to the truck Graham owns. The footage traces the truck from Graham's neighborhood to a location near the hole in the apartment's fence used by the robber in his escape.

---

[13] The testimony from the bank's employees established that the cash the robber took included eighty-one two-dollar bills and "bait money." The police never recovered any of the money taken in robbery.

The footage then traces the truck back to Graham's neighborhood. From the footage, the jury could find the finger of guilt pointing squarely to Graham. The phone data allowed the jury to conclude that Graham had the phone in the various locations tied to the footage they viewed. Moreover, nothing in the record suggests anyone other than Graham robbed the bank.

According to the statement Graham gave police, he was not in Conroe the day the robbery occurred. He suggests the evidence fails to sufficiently tie him to the crime because the police never recovered the money, gun, mask, clothes, or shoes the robber used in the robbery. But no alibi witnesses testified that Graham was not in Conroe. Moreover, nothing in the record explains how a truck matching Graham's truck and the records from the phone tracing the phone to locations consistent with the footage could have existed by mere coincidence. Graham's argument suggests nothing more than the State failed to meet its burden of proof, an argument the jury could reasonably reject.

According to Graham, the trial court's ruling, which allowed the jury to hear the detective's opinion, prejudiced him because the opinion, admitted on the first day of his trial, allowed the jury to decide the case before the parties rested. But the argument lacks merit. At every break, the trial court reminded the jury not to form any opinions until the jury deliberated on its verdict. While the prosecutor should

not have been allowed to elicit the detective's opinion, the prosecutor never mentioned the detective's opinion again during the trial. Finally, in closing argument, the prosecutor never asked the jury to consider the detective's opinion that Graham committed the robbery.

Generally, we "presume the jury follows the trial court's instructions in the manner presented."[14] In Graham's case, nothing in the appellate record shows the jury did not do so. Given the trial court's instruction, we presume the jury did not deliberate or discuss the detective's opinion before retiring to deliberate on its verdict.[15]

Here, the record as a whole fairly assures "the error did not have a substantial and injurious effect or influence in determining the jury's verdict."[16] We overrule Graham's sole issue and affirm the trial court's judgment.

AFFIRMED.

---

[14] *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

[15] *See id.* (instructing appellant's burden to rebut the presumption the jury failed to follow the trial court's instructions).

[16] *See Casey*, 215 S.W.3d at 885.

_____
HOLLIS HORTON
Justice

Submitted on April 16, 2019
Opinion Delivered October 23, 2019
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.